WEST *v.* OKLAHOMA TAX COMMISSION.

No. 489.   Argued March 29–30, 1948.—Decided June 14, 1948.

*Frank T. McCoy* argued the cause for appellant.   With him on the brief were *John R. Pearson* and *Frank Mahan.*

*R. F. Barry* and *Joe M. Whitaker* argued the cause for appellee.   With them on the brief was *C. W. King.*

MR. JUSTICE MURPHY delivered the opinion of the Court.

This appeal concerns the power of the State of Oklahoma to levy an inheritance tax on the estate of a restricted Osage Indian. Specifically, the problem is whether property held in trust by the United States for the benefit of the Indian may be included within the taxable estate.

Charles West, Jr., was a restricted, full-blood, unallotted, adult Osage Indian. He died intestate in 1940, a resident of Oklahoma. No certificate of competency was ever issued to him. Surviving him was his mother, appellant herein, who is a restricted, full-blood Osage Indian. The entire estate passed to her as the sole heir at law.[1]

The Oklahoma Tax Commission entered an order levying a tax on the transfer of the net estate, valued at $111,219.18. With penalties, the total tax imposed was $5,313.35. Appellant made timely objection to the inclusion of certain items in the taxable estate. These items formed the bulk of the estate and had been held in trust for the decedent by the United States, acting through the Secretary of the Interior. Act of June 28, 1906, 34 Stat. 539, as amended, 41 Stat. 1249, 45 Stat. 1478, 52 Stat. 1034. The trust properties involved were as follows:

(1) One and 915/2520ths Osage mineral headrights. This item represented the decedent's undivided interest in the oil, gas, coal and other minerals under the lands in Osage County, Oklahoma, said minerals having been

---

[1] The decedent was also survived by a widow. But she was prohibited by law from inheriting any part of the estate unless she was of Indian blood, a matter which was in dispute. A settlement was reached whereby the widow received a certain amount from the estate, apparently in return for giving up her claim as an heir.

reserved to the use of the Osage Tribe by the Act of June 28, 1906.[2]

(2) Surplus funds in the United States Treasury, representing accruals of income to the decedent from the headrights.

(3) Stocks and bonds purchased by and in the name of the United States and held for the decedent by the Secretary of the Interior. These purchases were made with the surplus funds accruing from the headrights.

(4) Trust funds in the hands of the Treasurer of the United States, representing decedent's share of the proceeds of the sale of the Osage Tribe's lands in Kansas.

(5) Personal property purchased with surplus funds.

Appellant claimed that these properties were immune from state taxation by virtue of the relevant provisions of the Constitution, treaties and laws of the United States; hence the Oklahoma Inheritance and Transfer Tax Act of 1939 (§§ 989–989t, Title 68, Okla. Stat. 1941) which authorized the assessment on the properties was invalid in this respect. The Oklahoma Tax Commission rejected this contention and the Supreme Court of Oklahoma affirmed. 200 Okla. —, 193 P. 2d 1017.

It is essential at the outset to understand the history and nature of the arrangement whereby the United States

---

[2] An Osage headright has been defined by one court as "the interest that a member of the tribe has in the Osage tribal trust estate, and the trust consists of the oil, gas, and mineral rights, and the funds which were placed to the credit of the Osage tribe, all fully set out in the above act [Act of June 28, 1906, 34 Stat. 539]." *In re Denison*, 38 F. 2d 662, 664. Another court has made this definition: "The right to receive the trust funds and the mineral interests at the end of the trust period, and during that period to participate in the distribution of the bonuses and royalties arising from the mineral estates and the interest on the trust funds, is an Osage headright." *Globe Indemnity Co.* v. *Bruce*, 81 F. 2d 143, 148–149. Headrights are not transferable and do not pass to a trustee in bankruptcy. *Taylor* v. *Tayrien*, 51 F. 2d 884; *Taylor* v. *Jones*, 51 F. 2d 892.

holds in trust the properties involved in this case. See Cohen, Handbook of Federal Indian Law (1945) 446–455. In 1866, the United States and the Cherokee Nation of Indians executed a comprehensive treaty covering their various relationships. 14 Stat. 799. It was there agreed that the United States might settle friendly Indians in certain areas of Cherokee territory, including what is now Osage County, Oklahoma; these areas had previously been conveyed by the United States to the Cherokees. The treaty further provided that the areas in question were to be conveyed in fee simple to the tribes settled by the United States "to be held in common or by their members in severalty as the United States may decide."

The Osage Indians subsequently moved to the Indian Territory and settled in what is now Osage County. In 1883, pursuant to the 1866 treaty, the Cherokees conveyed this area to the United States "in trust nevertheless and for the use and benefit of the said Osage and Kansas Indians." It is significant that fee simple title to the land was not conveyed at this time to the Osages; instead, the United States received that title as trustee for the Osages. Nor was any distinction here made between the land and the minerals thereunder, legal title to both being transferred to the United States.

On June 28, 1906, the Osage Allotment Act, providing for the distribution of Osage lands and properties, became effective. 34 Stat. 539. See *Levindale Lead Co.* v. *Coleman,* 241 U. S. 432. Provision was there made for the allotment to each tribal member of a 160-acre homestead, plus certain additional surplus lands. These allotted lands, said § 7, were to be set aside "for the sole use and benefit of the individual members of the tribe entitled thereto, or to their heirs, as herein provided." The homestead was to be inalienable and nontaxable for 25 years or during the life of the allottee. The surplus lands, however, were to be inalienable for 25 years and nontax-

able for 3 years, except that the Secretary of the Interior might issue a certificate of competence to an adult, authorizing him to sell all of his surplus lands; upon the issuance of such a certificate, or upon the death of the allottee, the surplus lands were to become immediately taxable. § 2, Seventh; *Choteau* v. *Burnet,* 283 U. S. 691.

Section 3 of the Act stated that the minerals covered by these lands were to be reserved to the Osage Tribe for a period of 25 years and that mineral leases and royalties were to be approved by the United States. Section 4 then provided that all money due or to become due to the tribe was to be held in trust by the United States for 25 years;[3] but these funds were to be segregated and credited pro rata to the individual members or their heirs, with interest accruing and being payable quarterly to the members. Royalties from the mineral leases were to be placed in the Treasury of the United States to the credit of the tribal members and distributed to the individual members in the same manner and at the same time as interest payments on other moneys held in trust. In this connection, it should be noted that quarterly payments of interest and royalties became so large that Congress later limited the amount of payments that could be made to those without certificates of competence; provision was also made for investing the surplus in bonds, stocks, etc.[4]

According to § 5 of this 1906 statute, at the end of the 25-year trust period "the lands, mineral interests, and

----

[3] The trust under which these funds were to be held was established in 1865 by treaty between the United States and the Great and Little Osage Indians, 14 Stat. 687. By the terms of this treaty, the proceeds of the sale of Osage lands in Kansas were to be placed in the United States Treasury to the credit of the tribe. Provisions for carrying out the terms of this treaty were made by Congress in 1880, 21 Stat. 291.

[4] By the Act of March 3, 1921, 41 Stat. 1249, Congress provided that so long as the income should be sufficient the adult Osage Indian without a certificate of competency should be paid $1,000

moneys, herein provided for and held in trust by the United States shall be the absolute property of the individual members of the Osage tribe, according to the role herein provided for, or their heirs, as herein provided, and deeds to said lands shall be issued to said members, or to their heirs, as herein provided, and said moneys shall be distributed to said members, or to their heirs, as herein provided, and said members shall have full control of said lands, moneys, and mineral interests, except as hereinbefore provided." It was also stated in § 2, Seventh, that the minerals upon the allotted lands "shall become the property of the individual owner of said land" at the expiration of 25 years, unless otherwise provided by Congress.

Moreover, § 6 provided that the lands, moneys and mineral interests of any deceased member of the Osage Tribe "shall descend to his or her legal heirs, according to the laws of the Territory of Oklahoma." Congress subsequently provided, in § 8 of the Act of April 18, 1912, 37 Stat. 86, 88, that any adult member of the tribe who was not mentally incompetent could by will dispose of "any or all of his estate, real, personal, or mixed, including trust funds, from which restrictions as to alienation have not been removed," in accordance with the laws of the State of Oklahoma. Such wills could not be probated, however, unless approved by the Secretary of the Interior before the death of the testator.

The 25-year trust period established by the 1906 statute has been extended several times by Congress, first to 1946 (41 Stat. 1249), then to 1958 (45 Stat. 1478), and finally to 1984 (52 Stat. 1034). The last extension pro-

---

quarterly. See also Act of Feb. 27, 1925, 43 Stat. 1008. In the Act of June 24, 1938, 52 Stat. 1034, it was provided that where the restricted Osage had surplus funds in excess of $10,000 he was to be paid $1,000 quarterly, but if he had surplus funds of less than $10,000 he was to receive quarterly only his current income, not to exceed $1,000 quarterly.

vided that the "lands, moneys, and other properties now or hereafter held in trust or under the supervision of the United States for the Osage Tribe of Indians, the members thereof, or their heirs and assigns, shall continue subject to such trusts and supervision until January 1, 1984, unless otherwise provided by Act of Congress."

Application of the foregoing provisions to the estate in issue produces this picture: Legal title to the mineral interests, the funds and the securities constituting the corpus of the trust estate is in the United States as trustee. The United States received legal title to the mineral interests in 1883, when it took what is now Osage County from the Cherokees in trust for the Osages; and that title has not subsequently been transferred. Legal title to the various funds and securities adhered to the United States as the pertinent trusts were established and developed. Beneficial title to these properties was vested in the decedent and is now held by his sole heir, the appellant. The beneficiary at all times has been entitled to at least a limited amount of interest and royalties arising out of the corpus. And the beneficiary has a reversionary interest in the corpus, an interest that will materialize only when the legal title passes from the United States at the end of the trust period. But until that period ends, the beneficiary has no control over the corpus. See *Globe Indemnity Co.* v. *Bruce,* 81 F. 2d 143, 150.

Since 1819, when *McCulloch* v. *Maryland,* 4 Wheat. 316, was decided, it has been established that the property of the United States is immune from any form of state taxation, unless Congress expressly consents to the imposition of such liability. *Van Brocklin* v. *Tennessee,* 117 U. S. 151; *United States* v. *Allegheny County,* 322 U. S. 174. This tax immunity grows out of the supremacy of the Federal Government and the necessity that it be able to deal with its own property free from any interference or embarrassment that state taxation might impose. *McCulloch* v.

*Maryland, supra; Wisconsin Railroad Co.* v. *Price County,* 133 U. S. 496.

In *United States* v. *Rickert,* 188 U. S. 432, the same rule was held to apply where the United States holds legal title to land in trust for an Indian or a tribe. The United States there held legal title to certain lands in trust for a band of Sioux Indians which was in actual possession of the lands. This Court held that neither the lands nor the permanent improvements thereon were subject to state or local ad valorem taxes. It was emphasized that the fee title remained in the United States in obvious execution of its protective policy toward its wards, the Sioux Indians. To tax these lands and the improvements thereon, without congressional consent, would be to tax a means employed by the Government to accomplish beneficent objects relative to a dependent class of individuals. Moreover, the United States had agreed to convey the lands to the allottees in fee at the end of the trust period "free of all charge or incumbrances whatsoever." If the tax in question were assessed and unpaid, the lands could be sold by the tax authorities. The United States would thus be so burdened that it could not discharge its obligation to convey unencumbered land without paying the taxes imposed from year to year.

Further application of the tax immunity rule to land held in trust by the United States for the benefit of Indians was made in *McCurdy* v. *United States,* 264 U. S. 484. That case involved surplus lands that had been allotted to members of the Osage Tribe. It will be recalled that the Osage Allotment Act of June 28, 1906, had made these surplus lands expressly taxable after three years or at the death of the allottee. The allottees in the *Mc-Curdy* case died within the three-year period but before deeds to their allotted lands had been executed and delivered to them. Oklahoma sought to place a tax on the lands, the taxable date being within the three-year period and before the execution and delivery of the deeds to the

heirs of the allottees. This Court held that legal title to the lands in issue was still in the United States as trustee on the taxable date, title not passing until the execution and delivery of the deeds. In reliance on the *Rickert* case, the conclusion was reached that the lands were not taxable while held in trust by the United States. See also *United States* v. *Board of Comm'rs of Fremont County, Wyo.,* 145 F. 2d 329; *United States* v. *Thurston County,* 143 F. 287.

Since the property here involved is all held in trust by the United States for the benefit of the decedent and his heirs, it is thought to be immune from any form of state taxation under the decisions in the *Rickert* and *McCurdy* cases. Reference is made to certain provisions of the Oklahoma Inheritance and Transfer Tax Act which indicate that the inheritance tax in issue might have a very real and direct effect upon the property to which the United States holds title, an effect similar to that which was emphasized in the *Rickert* case. The Act applies, of course, to the transfer of estates held in trust. § 989. Specific provision is then made in § 989*i* that "Taxes levied under this Act shall be and remain a lien upon all the property transferred until paid." Provision is also made for the sale of estate property if necessary to satisfy the tax. §§ 989*i* and 989*l*. It is therefore possible that if the tax were unpaid Oklahoma might try to place a lien upon the property which is being transferred, property as to which the United States holds legal title. Complications might arise as to the validity of such a lien. And the United States would be burdened to the extent of opposing the imposition of the lien or seeing that the tax was paid so as to avoid the lien.

Moreover, insofar as the inheritance tax is paid out of the surplus and trust funds held by the United States, there is a depletion of the corpus to which the United States holds legal title. Such depletion makes that much smaller the estate which the Government has seen fit to

hold in trust for the decedent's heirs. If the estate is to be tapped repeatedly by Oklahoma until 1984 by the deaths of the various heirs, the result may be a substantial decrease in the amount then available for distribution.

But our decision in *Oklahoma Tax Commission* v. *United States,* 319 U. S. 598, has foreclosed an application of the *Rickert* and *McCurdy* cases to the estate and inheritance tax situation. Among the properties involved in the *Oklahoma Tax Commission* case were restricted cash and securities, which could not be freely alienated or used by the Indians without the approval of the Secretary of the Interior. We held that the restriction, without more, was not the equivalent of a congressional grant of estate tax immunity for the transfer of the cash and securities. Moreover, express repudiation was made of the concept that these restricted properties were federal instrumentalities and therefore constitutionally exempt from estate tax consequences. See also *Helvering* v. *Mountain Producers Corp.,* 303 U. S. 376. The very foundation upon which the *Rickert* case rested was thus held to be inapplicable.

We fail to see any substantial difference for estate tax purposes between restricted property and trust property. The power of Congress over both types of property is the same. *Board of Commissioners* v. *Seber,* 318 U. S. 705, 717; *United States* v. *Ramsey,* 271 U. S. 467, 471. Both devices have the common purpose of protecting those who have been found by Congress to be unable yet to assume a fully independent status relative to property. The effect which an estate or inheritance tax may have is the same in both instances; liens may be placed on both restricted and trust properties and lead to complications; and both types of property may of necessity be depleted to assure payment of the tax. The fact that the United States holds legal title as to trust property but not as to restricted property affords no distinguishing characteristic from the standpoint of an estate tax. In addition, Con-

gress has given no indication whatever that trust properties in general are to be given any greater tax exemption than restricted properties. Hence the *Oklahoma Tax Commission* case must control our disposition of this proceeding.

Implicit in this Court's refusal to apply the *Rickert* doctrine to an estate or inheritance tax situation is a recognition that such a tax rests upon a basis different from that underlying a property tax. An inheritance or estate tax is not levied on the property of which an estate is composed. Rather it is imposed upon the shifting of economic benefits and the privilege of transmitting or receiving such benefits. *United States Trust Co.* v. *Helvering,* 307 U. S. 57, 60; *Whitney* v. *Tax Commission,* 309 U. S. 530, 538. In this case, for example, the decedent had a vested interest in his Osage headright; and he had the right to receive the annual income from the trust properties and to receive all the properties at the end of the trust period. At his death, these interests and rights passed to his heir. It is the transfer of these incidents, rather than the trust properties themselves, that is the subject of the inheritance tax in question. In this setting, refinements of title are immaterial. Whether legal title to the properties is in the United States or in the decedent and his heir is of no consequence to the taxability of the transfer.

The result of permitting the imposition of the inheritance tax on the transfer of trust properties may be, as we have noted, to deplete the trust corpus and to create lien difficulties. But those are normal and intended consequences of the inheritance tax. And until Congress has in some affirmative way indicated that these burdens require that the transfer be immune from the inheritance tax liability, the *Oklahoma Tax Commission* case permits that liability to be imposed. But that case also makes clear that should any of the properties transferred be exempted by Congress from direct taxation they cannot

be included in the estate for inheritance tax purposes. No such properties are here involved, however.

We have considered the other points raised by the appellant but deem them to be without merit. The judgment below is therefore

*Affirmed.*

THE CHIEF JUSTICE, MR. JUSTICE FRANKFURTER and MR. JUSTICE DOUGLAS dissent.