Robert C. KIRKWOOD, Controller of the State of California, Appellant,

v.

Lee ARENAS, Richard Brown Arenas and United States of America, Appellees.

No. 15243.

United States Court of Appeals Ninth Circuit.

April 25, 1957.

864

Walter H. Miller, Chief Asst. Inheritance Tax Atty., Los Angeles, Cal., James W. Hickey, Chief, Sacramento, Cal., Vincent J. McMahon, Los Angeles, Cal., for appellant.

Irl Davis Brett, Laughlin E. Waters, U. S. Atty., Los Angeles, Cal., Perry W. Morton, Asst. Atty. Gen., Roger P. Marquis, Fred W. Smith, Washington, D. C., for appellees.

Before STEPHENS, CHAMBERS and BARNES, Circuit Judges.

STEPHENS, Circuit Judge.

The basic issue on this appeal is whether, upon the death of a member of the Agua Caliente Band of Mission Indians, the transfer of the member's trust allotment to his heirs is subject to an inheritance tax by the State of California. The problem arises because of the following facts.

Appellee, Lee Arenas, was married to Guadalupe Rice Arenas, and during their marriage, both applied for trust allotments on lands in and near the resort city of Palm Springs, California, in accordance with the Mission Indian Act of

1891.[1] Selections were made by them in 1923 and 1927. See Arenas v. United States, 322 U.S. 419, 64 S.Ct. 1090, 88 L.Ed. 1363. Litigation ensued, and it was not until February 24, 1949, that trust patents were issued. Because Guadalupe had died intestate on March 26, 1937, her trust patent was issued to her unnamed heirs and devisees. The patent was issued *nunc pro tunc* May 9, 1927, in accordance with Arenas v. United States, 9 Cir., 1946, 158 F.2d 730, certiorari denied, 1947, 331 U.S. 842, 67 S.Ct. 1531, 91 L.Ed. 1853.

Guadalupe's interest passed one-half to appellee, Lee Arenas, and one-half to her daughter, Eleuteria Brown Arenas. Arenas v. United States, 9 Cir., 1952, 197 F.2d 418. Eleuteria Brown Arenas also in 1949 had received a trust allotment in her own right, and when she died in 1954, her interest in lands received from her mother, Guadalupe, as well as her interest in her own allotment received from the United States, passed to her son, appellee Richard Brown Arenas.

In 1951 a judgment was entered in another action holding that attorneys who represented the Indians in litigation concerning their rights to trust allotments were entitled to a lien on the trust allotments in payment of legal fees. Authorization for the maintenance of the litigation was by virtue of Arenas v. Preston, 9 Cir., 1950, 181 F.2d 62. Certain portions of the lands included in the allotments were sold, and part of the proceeds were used to discharge the liens. Remnants of the proceeds of the sales now rest in the Registry of the District Court. The State of California now seeks to impress a lien upon the money in the Registry for State inheritance taxes allegedly due. The money was placed in the Registry under the understanding of parties and Court that it should retain the restrictions which were upon the land prior to sale. The claimed inheritance tax was based upon the succession of appellee Lee Arenas as surviving husband of Guadalupe and Richard Brown Arenas as surviving son of Eleuteria Brown Arenas, to the allotted lands. The District Court, in a comprehensive opinion, held that the properties transferred in the instant case were exempted by Congress from direct taxation and thus could not be included in the estate for inheritance tax purposes. The opinion is reported as Arenas v. United States, 140 F.Supp. 606.

### The Appeal

■ Oklahoma Tax Commission v. United States, 319 U.S. 598, 63 S.Ct. 1284, 87 L.Ed. 1612 and West v. Oklahoma Tax Commission, 334 U.S. 717, 68 S.Ct. 1223, 92 L.Ed. 1676, are authorities for the proposition that merely because property transferred at the death of an Indian is held in trust by the United States does not *per se* mean that the property is immune from inheritance tax; that, in order to be immune from inheritance tax, it must be shown that the property was exempted by Congress from direct taxation.

■ The District Court held that when Congress enacted legislation ceding limited state jurisdiction over civil and criminal actions in Indian lands of California and, in such legislation, declared that:

"Nothing * * * [herein] shall authorize the alienation, encumbrance, or taxation of any real or personal property * * * belonging to any Indian * * * that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States * * *." 67 Stat. 588, 589, Act Aug. 15, 1953, 28 U.S.C. § 1360 (b), 18 U.S.C. § 1162(b).

it intended to exempt such Indians' land from direct taxation. We doubt the validity of such construction. Rather, we think the quoted part of the Act merely negatives the idea that any change in the law as to "alienation, encumbrance, or taxation" of Indians' property was intended. The quoted part of the Act, however, is entirely consistent with, and in

---

1. Mission Indian Act, 26 Stat. 712, Act Jan. 12, 1891.

effect is a reaffirmation of, the law as it stood prior to its enactment, which, in the view of the trial court, and in our view, exempted the property from State taxation as was attempted. The legislative history of the provision supports the view we here express. See Legislative History of Title 28, U.S.C. § 1360, Act of Aug. 15, 1953, U.S.Code, Congressional and Administrative News, Vol. 2, p. 2409. No mention is made therein of any intent to exempt additional lands from taxation. At this point we should take note of Section 6 of the General Allotment Act,[2] 25 U.S.C.A. § 349, which the District Court held exempted the trust lands from taxation. That section provides in part:

> "That the Secretary of the Interior may, in his discretion, and he is authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, *and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed* and said land shall not be liable to the satisfaction of any debt contracted prior to the issuing of such patent * * *". (Emphasis supplied.)

The Supreme Court recently, in Squire v. Capoeman, 351 U.S. 1, 7, 76 S.Ct. 611, 616, 100 L.Ed. 883, said that Section 6 of the General Allotment Act evinced

> "a congressional intent to subject an Indian allotment to all taxes only

after a patent in fee is issued to the allottee. This, in turn, implies that, until such time as the patent is issued, the allotment shall be free from all taxes, both those in being and those which might in the future be enacted."

Appellant argues, however, that the trust allotments awarded to the Mission Indians do not come within the provisions of the General Allotment Act, but are governed by the Mission Indian Act; and therefore Section 6 of the General Allotment Act is not applicable in the instant case. Based on this premise, appellant argues that Section 5 of the Mission Indian Act is the only section here pertinent and that Section 5 of the Mission Indian Act does not exempt the trust allotments of the Agua Caliente Band of Mission Indians from inheritance taxes imposed by the State of California. Section 5 of the Mission Indian Act provides that the United States, at the expiration of the trust period, will convey a patent "to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever."

We are of the opinion that the Mission Indian Act and the General Allotment Act are to be applied in *pari materia* in the instant case.[3] In Arenas v. United States, 322 U.S. 419, 422, 64 S.Ct. 1090, 88 L.Ed. 1363, it was pointed out that Congress passed the Act of March 2, 1917,[4] by which it "authorized and directed" the Secretary of the Interior to proceed in the allotment in sev-

---

2. General Allotment Act of 1887, 24 Stat. 388, 25 U.S.C.A. § 331 et seq.

3. The United States, in a memorandum brief, calls our attention to a Joint Resolution of June 19, 1902, by the Senate and House of Representatives, which we hold is also persuasive that the two Acts should be construed in **pari materia**. That resolution states:
   "Insofar as not otherwise specially provided, all allotments in severalty to Indians, outside of the Indian Territory, shall be made in conformity to the provisions of the Act approved February eighth, eighteen hundred and eighty-

seven, entitled 'An Act to provide for the allotments of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes [General Allotment Act of 1887],' and other general Acts amendatory thereof or supplemental thereto, and shall be subject to all the restrictions and carry all the privileges incident to allotments made under said Act and other general Acts amendatory thereof or supplemental thereto." 32 Stat. 744.

4. 39 Stat. 969, 976.

eralty to Mission Indians under the Act of 1910,[5] which was amendatory of the General Allotment Act. It was also brought out in United States v. Arenas, 9 Cir., 1947, 158 F.2d 730, 735, that the Special Allotting Agent, Harry E. Wadsworth, was directed by the Commissioner of Indian Affairs to make the Mission Indian allotments "under the provisions of the Act of Congress of February 8, 1887 (24 Stat. 388) as amended by the Act of June 25, 1910 (36 Stat. 855) and supplemented by the Act of March 2, 1917 (39 Stat. 969–976)." This Court, in Arenas v. United States, 9 Cir., 1952, 197 F.2d 418, 422, also inferentially held that Title 25, U.S.C.A. § 348, derived from Section 5 of the General Allotment Act, was applicable to the Mission Indians and had the effect of incorporating in the Mission Indian Act the California succession or descent statute. But it should be noted that such adoption did not subject the Indian property to the ordinary burdens, including taxation of California property.

When the two Acts are read and applied in *pari materia*, it is clear that the trust lands in the instant case are exempt from direct taxation. Squire v. Capoeman, supra; Oklahoma Tax Commission v. United States, supra; West v. Oklahoma Tax Commission, supra.

But assuming arguendo, that Section 6 of the General Allotment Act is not applicable to the Mission Indians, we are of the opinion that Section 5 of the Mission Indian Act, when it uses the words "free of all charge of incumbrance whatsoever," in itself evinces congressional intent to exempt the Indian allotment from all taxes during the trust period. A "charge" may be defined as a lien, incumbrance or claim which is to be satisfied out of the specific thing or proceeds thereof to which it applied. Bouvier's Law Dictionary. The obligation bears upon the particular piece of land in the instant case and would in effect appropriate a definite portion of the land to satisfaction of the obligation. Like-

wise, "incumbrance" may be defined as any right to, or interest in, land which may subsist in third persons, to the diminution of the value of the estate of the tenant, but consistently with the passing of the fee. Bouvier's Law Dictionary. The plain import of the words used convinces us that they were intended to exempt the lands from taxation. This construction is in accord with our opinion in United States v. Nez Perce County, Idaho, 9 Cir., 1938, 95 F.2d 232, 235.

The Supreme Court, in Squire v. Capoeman, supra, had occasion to consider the legal effect or meaning of the words "charge or incumbrance." It was there stated, 351 U.S. at page 6, 76 S.Ct. at page 615:

"The courts below held that imposition of the tax here in question is inconsistent with the Government's promise to transfer the fee 'free of all charge or incumbrance whatsoever.' Although this statutory provision is not expressly couched in terms of nontaxability, this Court has said that

" 'Doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith. Hence, in the words of Chief Justice Marshall: "The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of, which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense." Worcester v. State of Georgia, 6 Pet. 515, 582, 8 L.Ed. 483.' Carpenter v. Shaw, 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed. 478.

"Thus the general words 'charge or incumbrance' might well be sufficient to include taxation. But Congress, in an amendment to the General Allotment Act, gave additional

---

5. Act of June 25, 1910, 36 Stat. 859.

force to respondents' position. Section 6 of that Act was amended to include a proviso—

Section 6 cited. See 25 U.S.C.A. § 349]

\*  \*  \*  \*  \*  \*

" ' \*  \*  \* The literal language of the proviso evinces a congressional intent to subject an Indian allotment to all taxes only after a patent in fee is issued to the allottee  \*  \*  \* "

In order to satisfy ourselves that we are correct, we have made an exhaustive search of the Congressional Record to determine whether Congress, in amending Section 6 of the General Allotment Act,

Title 25, U.S.C.A. § 349, meant to change existing law as to the taxation of the allotments merely because under the amended section the Secretary of the Interior is authorized to issue a fee simple with "all restrictions as to sale, incumbrance, or taxation removed.[6] It is still provided in Section 5 of the General Allotment Act, Title 25, U.S.C.A. § 348, that the United States will issue at the end of the trust period a fee "discharged of said trust and free of all charge or incumbrance." Section 5 of the Mission Indian Act and Section 5 of the General Allotment Act contain identical language.

6. We quote from the Congressional Record—House. 59th Congress, 1st Session, Vol. 40. Part 4, page 3599; March 9, 1906. (H.R. 11946)

"*Mr. Fitzgerald.* I would like to make an inquiry. This bill, if I understand it correctly, makes two changes in the present law. First, it gives to the Secretary of the Interior power to issue patents, regardless of the twenty-five-year restriction, whenever he deems it proper.

"*Mr. Burke of South Dakota* (Chairman of the House Indian Affairs Committee and author of the bill). Yes sir.

"*Mr. Fitzgerald.* And, secondly, it changes the law so that the mere allotment of land to an Indian does not confer citizenship upon him.

"*Mr. Burke of South Dakota.* It leaves him subject only to the jurisdiction of the United States until he gets his fee simple patent.

"*Mr. Fitzgerald. Are those the only two changes?* (Emphasis supplied.)

"*Mr. Burke of South Dakota. Those are the only changes.* (Emphasis supplied.)

"*Mr. Crumpacker.* Under the law as it now stands the Secretary of the Interior does not have authority to issue fee simple patents to Indians whom he may conclude are entitled to them?

"*Mr. Burke of South Dakota.* That is true.

\*  \*  \*  \*  \*

"*Mr. Curtis.* The main advantage of this bill is that under existing law the Supreme Court has held that after a patent has issued (the Court said the word "patent" was not happily chosen to express the thought which, it is clear, all parts of the section being considered, Congress intended to express), notwithstanding the Indian does not secure a title in fee for twenty-five years, he be-

comes a citizen of the United States, and that the State courts have full jurisdiction over him, but not over his property. *They can not assess and tax the lands, nor can a State enact a law which will prevent the government, at the time agreed, conveying the allottee the land in fee.* Now, this bill, if enacted, will leave him under the control of the Government until he secures a patent conveying the fee, whether he gets it under an agreement or whether it is issued to him under the law by the Secretary of the Interior  \*  \*  \*." (Emphasis supplied.) (p. 3600)

"*Mr. Dixon of Montana.* Mr. Speaker, I want to ask the gentleman from South Dakota [Mr. Burke] if the purpose of the bill is not to prevent the blanket Indians by wholesale becoming citizens by allotment, and still allow the intelligent Indians on applications to become citizens by allotment.

"*Mr. Burke of South Dakota.* That is the purpose of the law, and further, to protect the Indians from the sale of liquor.  \*  \*  \*" (p. 3601)

"*Mr. Steenerson.* I understand that in the proviso to this bill it is provided for granting lands in fee without any restriction; that that provision is not limited. That applies to all Indians anywhere that have allotments?

"*Mr. Burke of South Dakota.* It does.

"*Mr. Steenerson.* And is operative whether allotment has already been made or will be made in the future?

"*Mr. Burke of South Dakota.* Yes."

See also Congressional Record, 59th Congress, 1st Session, Vol. 40, Part 6, pp. 5605, 5606, 5805, for debates on the bill in the Senate. See also p. 5980 where House concurs in Senate amendments.

We are of the opinion that the amendment of Section 6 of the General Allotment Act was not intended as a change of prior law as to taxation of allotted lands. We hold that Section 5 of the Mission Indian Act has the same effect as Section 6 of the General Allotment Act as to taxability of allotted lands; and therefore property of the Agua Caliente Band of Mission Indians, held under trust patents, is exempt from direct taxation, including inheritance taxes. For Ninth Circuit cases in accord with our interpretation of the words "free of all charge or incumbrance whatsoever" see United States v. Nez Perce County, Idaho, 9 Cir., 95 F.2d 232, 235; Glacier County, Montana v. United States, 9 Cir., 1938, 99 F.2d 733; United States v. Benewah County, Idaho, 9 Cir., 1923, 290 F. 628. See also Morrow v. United States, 8 Cir., 243 F. 854; Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941; United States v. Spaeth, D.C. Minn., 24 F.Supp. 465.

The judgment of the District Court is affirmed.