[Civ. No. 50867. First Dist., Div. Two. Nov. 24, 1981.]

Estate of FRANK W. JOHNSON, Deceased.
KENNETH CORY, as State Controller, Petitioner and Appellant, v.
GEORGIA CAMPBELL, Objector and Respondent.

---

COUNSEL

Myron Siedorf, Edwin Rosenthal and Edgar Sanderson for Petitioner and Appellant.

Henry J. Sockbeson, Michael S. Pfeffer, Marilyn B. Miles and David J. Rapport, Lawrence O. Eitzen and Eitzen & Schaub for Objector and Respondent.

---

OPINION

**SMITH, J.**—This is an appeal by the State Controller from an order of the superior court finding no inheritance tax owed to the State of California. The lower court held that the intestate transfer of property located on the Hoopa Valley Indian Reservation from a deceased resident of the reservation to his heir, also a reservation resident, was not within the taxing jurisdiction of the state. We agree.

Frank Johnson, a member of the Hoopa Indian Tribe, died intestate. He lived, worked and died on the reservation. He was never married and died without issue. All of his property passed to his mother, Georgia Campbell, also a resident of the Hoopa Valley Reservation and member of the Hoopa Tribe.

The decedent's nephew, Joe LeMieux, petitioned the Humboldt County Superior Court for letters of administration. An order for probate was entered, and letters of administration were issued. The inheritance administrator reported inheritance tax due in the amount of $2,849. This report was based upon the assessed value of real property located within the reservation and of a pension fund and life insurance benefits accrued by decedent during his lifetime of employment within the reservation. All of the real property listed in the inventory and appraisement is located within the boundaries of the Hoopa Reservation, and title was held by decedent in fee patent.[1]

Georgia Campbell, mother and sole heir of decedent, filed an objection to the imposition of an inheritance tax. She argued that, because the subject real property was located within the Hoopa Reservation and the pension and insurance benefits were payable to a reservation resident, the state was without jurisdiction to impose an inheritance tax.

---

[1]The Hoopa Valley Indian Reservation was authorized by statute and created by executive order. A summary of the history of this reservation may be found in *Mattz v. Arnett* (1973) 412 U.S. 481, 493-494 [37 L.Ed.2d 92, 99-100, 93 S.Ct. 2245], and *Short v. United States* (Ct. Cl. 1973) 486 F.2d 561, 562-564.) Part of the land within the boundaries of the reservation is owned in fee by both Indians and non-Indians; part is held by the United States in trust for the tribe, and the remainder is held in trust for individual Indians.

The lower court upheld Ms. Campbell's objections. The court concluded that federal law, and particularly section 4 of Public Law No. 280 (67 Stat. 589, 28 U.S.C. § 1360), did not give the State of California a general grant of authority to impose an inheritance tax upon Indians on the reservation.

The sole issue before this court is whether, under either section 6 of the General Allotment Act of 1887 (24 Stat. 390, 25 U.S.C. § 349) or section 4 of Public Law No. 280, California has jurisdiction to impose an inheritance tax upon the intestate transfer of personal property and nontrust reservation real property from one reservation Indian to another.

I

The principles governing the resolution of this issue are well-settled. "'The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history.'" (*Rice* v. *Olson* (1945) 324 U.S. 786, 789 [89 L.Ed. 1367, 1369, 65 S.Ct. 989], quoted in *McClanahan* v. *Arizona State Tax Comm'n* (1973) 411 U.S. 164, 168 [36 L.Ed.2d 129, 133, 93 S.Ct. 1257].) This policy, initially based upon a concept of Indian sovereignty, was first enunciated in the early case of *Worcester* v. *Georgia* (1832) 31 U.S. (6 Pet.) 515, 557 [8 L.Ed. 483, 499], wherein the Supreme Court held that Indian nations were "distinct political communities having territorial boundaries within which their authority is exclusive . . . ." (See also *United States* v. *Kagama* (1886) 118 U.S. 375, 383-384 [30 L.Ed. 228, 231, 6 S.Ct. 1109].)

More recently, the "trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption." (*McClanahan* v. *Arizona State Tax Comm'n, supra*, at p. 172 [36 L.Ed.2d at p. 135].) Recent cases have defined the extent of federal preemption by analyzing federal treaties and statutes. (*Moe* v. *Salish & Kootenai Tribes* (1976) 425 U.S. 463, 475-479 [48 L.Ed.2d 96, 107-109, 96 S.Ct. 1634]; *Mescalero Apache Tribe* v. *Jones* (1973) 411 U.S. 145, 148 [36 L.Ed.2d 114, 119, 93 S.Ct. 1267]; *McClanahan* v. *Arizona State Tax Comm'n, supra*, at p. 172.) Federal treaties and statutes, however, must be viewed against the "backdrop" of Indian sovereignty. As noted by the Supreme Court in *McClanahan* v. *Arizona State Tax Comm'n, supra* at pages 172-173 [36 L.Ed.2d at pages 135-136], "[i]t must always be remembered that the various Indian tribes were once independent 'and sovereign nations, and that their

claim to sovereignty long predates that of our own Government. Indians today are American citizens. They have the right to vote, to use state courts, and they receive some state services. But it is nonetheless still true, as it was in the last century, that '[t]he relation of the Indian tribes living within the borders of the United States ... [is] an anomalous one and of a complex character .... They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as States, not as nations, not as possessed of full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided.' [Citation] [Fns. ommitted]." (See also *Bryan* v. *Itasca County* (1976) 426 U.S. 373, 376, fn. 2 [48 L.Ed.2d 710, 714, 96 S.Ct. 2102]; *Moe* v. *Salish & Kootenai Tribes, supra*, at p. 475 [48 L.Ed.2d at p. 107].)

It has also been the policy of the courts that legislation affecting Indians should be liberally construed in their interest and doubtful expressions resolved in their favor. (*Bryan* v. *Itasca County, supra*, at p. 392 [48 L.Ed.2d at p. 723]; *McClanahan* v. *Arizona State Tax Comm'n, supra*, at p. 174 [36 L.Ed.2d at p. 136].) While the assimilationist policy prevailing at the beginning of this century must be considered in analyzing statutes which were enacted at that time, it should also be kept in mind that present federal policy favors the strengthening of tribal self-government. (*Bryan* v. *Itasca County, supra* at p. 389, fn. 14 [48 L.Ed.2d at p. 721].) "[C]ourts 'are not obliged in ambiguous instances to strain to implement [an assimilationist] policy Congress has now rejected, particularly where to do so will interfere with the present congressional approach to what is, after all, an ongoing relationship'." (*Ibid.*; see, generally, Rep. of U. S. Com. on Civ. Rights (1981) Indian Tribes: A Continuing Quest for Survival pp. 20-23.)

"[I]n the special area of state taxation, absent cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory authority for taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation, and *McClanahan* v. *Arizona State Tax Comm'n, supra*, lays to rest any doubt in this respect by holding that such taxation is not permissible absent congressional consent." (*Mescalero Apache Tribe* v. *Jones, supra*, 411 U. S. 145, 148; see also *Moe* v. *Salish & Kootenai Tribes, supra*, 425 U.S. at pp. 475-476 [48 L.Ed.2d at pp. 107-108].)

II

With these principles in mind, we now turn to an analysis of applicable federal statutes. For the reasons that follow, we reject appellant's contention that, under section 6 of the General Allotment Act of 1887, the issuance to decedent of a fee simple patent to his land rendered the intestate transfer of his property subject to state inheritance tax.

Traditionally, the right of possession to Indian land was vested in the tribe, rather than in individual members. (U. S. Dept. of Interior, Federal Indian Law (1958) pp. 757-758.) The General Allotment Act was designed to break up the traditional reservation by allotting specific parcels of land in severality[2] to Indians living on reservations and with tribal consent to sell off surplus lands. For a period of 25 years, the allotted lands were held in trust patent. Once the lands were patented in fee, i.e. given over by the government in fee simple to individual Indians, the Indian had "the benefit of and [was] subject to the laws, both civil and criminal, of the State or Territory ..." (25 U.S.C. § 349; U.S. Dept. of Interior, Federal Indian Law, *supra*, at p. 785.)

In *Moe* v. *Salish & Kootenai Tribes, supra*, at pages 477-479 [48 L.Ed.2d at pages 108-109], the Supreme Court rejected the contention that state jurisdiction to impose cigarette sales taxes and personal property taxes was among the civil laws to which an Indian fee patentee and his property had been made subject by the General Allotment Act where the reservation was composed of both fee and trust lands. The court pointed out that the policy of allotment of lands to individual Indians and sale of surplus reservation land to non-Indians had been repudiated in 1934 by the Indian Reorganization Act (48 Stat. 984, amended and codified as 25 U.S.C. § 461 et seq.) and concluded that "Congress by its more modern legislation has evinced a clear intent to eschew any such 'checkerboard' approach within an existing Indian reservation ...." (*Id.* at p. 479 [48 L.Ed.2d at p. 110].)

Here, as in *Moe*, the reservation is composed of both trust and fee lands. Although the present case involves an inheritance tax while *Moe* involved a cigarette sales tax and personal property taxes, we deem this

---

[2]Severality refers to the holding of property solely, separately and individually. A tenant in severality holds the land exclusively and solely for the duration of his or her estate without any other person holding joint rights. (See *Crain* v. *Foster* (1959) 230 Ark. 190 [322 S.W.2d 443, 444].)

a distinction without a difference, for, in each case, a distinction based upon the fee or trust status of land would undermine the territorial integrity of a reservation. (See, generally, Craig, *The Indian Tax Cases —A Territorial Analysis* (1979) 9 N.M. L.Rev. 221, 244-245.)[3]

## III

We also reject appellant's contention that section 4 of Public Law No. 280 (67 Stat. 589, 28 U.S.C. § 1360) granted California the authority to impose the tax in question.

In 1953, the policy of encouraging Indian self-government and tribal integrity as reflected in the Indian Reorganization Act received a setback by the enactment of Public Law No. 280. Here, Congress, in an apparent attempt to reestablish a policy of assimilation without entirely abandoning the Indian to state authority and control, transferred to five willing states, among them California, and offered to all others, civil and criminal jurisdiction over reservation Indians.[4]

---

[3]Appellant maintains that, because lands held by fee patent are subject to property taxes, the intestate transfer of a fee patentee's property should also be subject to inheritance tax. Whether such lands are subject to a property tax (see, e.g. *Chatterton* v. *Lukin* (1945) 116 Mont. 419 [154 P.2d 798] cert. den., 325 U.S. 880 [89 L.Ed. 1996, 65 S.Ct. 1572]; *United States* v. *Spaeth* (D. Minn. 1938) 24 F.Supp. 465), however, is not the issue, for an inheritance tax is not a tax upon the property itself but rather upon its transfer. (See Rev. & Tax. Code, §§ 13401, 13601; 5 Witkin, Summary of Cal. Law (8th ed. 1974) Taxation, § 214, pp. 4183-4184.)

We are aware that a federal court in *Nash* v. *Wiseman* (W.D.Okla. 1963) 227 F.Supp. 552 has concluded that inherited allotted lands which are held in fee patent by the decedent are subject to federal estate taxes. That case, however, was decided before the United States Supreme Court's decision in *Moe.*

[4]Section 4 of Public Law No. 280 in part states: "(a) Each of the States listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State:

"State of                                    Indian country affected

Alaska  - - - - - - - - - - - - - All Indian country within the State

California  - - - - - - - - - - - All Indian country within the State

Minnesota  - - - - - - - - - - - All Indian country within the State, except the Red Lake Reservation

Nebraska   - - - - - - - - - - - All Indian country within the State

Oregon  - - - - - - - - - - - - - All Indian country within the State, except the Warm Springs Reservation

Wisconsin  - - - - - - - - - - - All Indian country within the State

"(b) Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any

Public Law No. 280 has been narrowly construed in light of the modern trend to reaffirm the Indians' semi-autonomous status as a separate people with the power of regulating their internal and social relations subject to diminution only by express congressional enactment. (See *United States* v. *Mazurie* (1975) 419 U.S. 544, 558 [42 L.Ed.2d 706, 717, 95 S.Ct. 710].) The Indian Civil Rights Act of 1968 (82 Stat. 77, 25 U.S.C. § 1301 et seq.) is further indication of the shift in federal policy away from assimilation toward the strengthening of tribal institutions and fostering of economic development and stability. (See Goldberg, *Public Law 280: The Limits of State Jurisdiction over Reservation Indians* (1975) 22 UCLA L.Rev. 535, 550.)

In *Bryan* v. *Itasca County, supra*, 426 U.S. 373, the United States Supreme Court examined the State of Minnesota's imposition of a personal property tax on a mobilehome located on Indian trust land. In an unanimous opinion, the Supreme Court observed that such a tax was precluded in the absence of express congressional consent and held that section 4 of Public Law No. 280 did not constitute such consent. (*Id.*, at pp. 377, 390-393 [48 L.Ed.2d at pp. 714, 722-723].)

The court in *Bryan* undertook an extensive analysis of the legislative history of Public Law No. 280 and determined that the primary concern of Congress was "with the problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement." (*Id.*, at p. 379 [48 L.Ed.2d at p. 715].) The court concluded that the provision for state civil jurisdiction was primarily enacted "to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens, by permitting the courts of the States to decide such disputes . . . ." (*Id.*, at p. 383 [48 L.Ed.2d at p. 718].) Thus, the court held, the wording in section 4(a) stating that the civil laws of the named states will "have the same force and effect within such Indian country as they have elsewhere within the State" authorizes application by the state courts of their rules of decision to decide disputes but does not authorize application of general state civil regulatory control over Indian reservations. (*Id.*, at p. 384 [48 L.Ed.2d at p. 718].)

---

Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein."

After examining committee reports and floor discussions in both houses, the court noted the total absence of any mention or discussion regarding Congress' intent to confer upon the states authority to tax Indians or Indian property on reservations. (*Id.*, at p. 381 [48 L.Ed.2d at p. 717].) Of special import to the instant case is the *Bryan* court's conclusion with regard to section 4(b) of Public Law No. 280, excluding taxation of any real or personal property belonging to an Indian held in trust or subject to a restriction against alienation, that "even if read narrowly to apply only to taxation levied against trust property directly, § 4(b) certainly does not expressly authorize all other taxation of reservation Indians." (*Id.*, at p. 391 [48 L.Ed.2d at p. 722].)

The court in *Bryan* made it clear that a statute must express congressional intent to abolish the long-standing rule of Indian tax immunity in clear and unequivocal language. (*Id.*, at p. 392 [48 L.Ed.2d at p. 723].) Consistent with the reasoning and holding of that case, we conclude that there is nothing in Public Law No. 280 that expresses legislative intent to authorize the imposition of the tax in question.

Appellant contends that inheritance taxation is a tax upon a privilege rather than upon an inherent right and therefore distinguishable from other prohibited reservation taxes. A similar distinction, however, was rejected in *Washington* v. *Confederated Tribes* (1980) 447 U.S. 134, 163 [65 L.Ed.2d 10, 35, 100 S.Ct. 2069], wherein the Supreme Court held that the State of Montana might not impose a motor vehicle tax on vehicles owned by a tribe or its members and used both on and off the reservation, and thus circumvent the holding of *Moe* and *McClanahan*, by labelling the excise tax as a "privilege" tax.

Appellant contends that *West* v. *Oklahoma Tax Comm'n* (1948) 334 U.S. 717 [92 L.Ed. 1676, 68 S.Ct. 1223] and *Oklahoma Tax Comm'n* v. *U.S.* (1943) 319 U.S. 598 [87 L.Ed. 1612, 63 S.Ct. 1284] control in the instant case. Both of these cases expressed the proposition that property that is restricted or held in trust is not necessarily immune from inheritance taxation. (*West* v. *Oklahoma Tax Comm'n, supra*, at p. 726 [92 L.Ed. at p. 1681]; *Oklahoma Tax Comm'n* v. *U.S., supra*, at pp. 601-602 [87 L.Ed at pp. 1615-1616].) *Oklahoma Tax Comm'n* relied upon the old doctrine of assimilation—that the Oklahoma Indians are actually citizens with little to distinguish them from other citizens. (*Id.*, at p. 603 [87 L.Ed. at p. 1616].) The court held that restricted cash and securities and miscellaneous personal property were taxable but that allotted lands exempt from direct taxation were also exempt from

inheritance tax. (*Id.* at p. 611 [87 L.Ed. at p. 1620].) *West* applied the holding of *Oklahoma Tax Comm'n* to the succession of property held in trust. (*West* v. *Oklahoma Tax Comm'n, supra*, at p. 726.)

The facts of those cases, however, are clearly distinguishable from those of the instant case, for the Osage Indians, the Indians involved in those cases, had no effective tribal authority and had been assimilated into the general community. (*Oklahoma Tax Comm'n* v. *U.S., supra*, at p. 603; see also *United States* v. *Mason* (1973) 412 U.S. 391, 396, fn. 7 [37 L.Ed.2d 22, 26, 93 S.Ct. 2202]; *McClanahan* v. *Arizona State Tax Comm'n, supra*, 411 U.S. 164, 167-168, 171 [36 L.Ed.2d 129, 132-133, 135].) Moreover, those cases did not arise under either the General Allotment Act or Public Law No. 280.

For the foregoing reasons, we hold that neither the General Allotment Act nor Public Law No. 280 confers jurisdiction upon California to impose an inheritance tax upon the intestate transfer of personal property and nontrust reservation real property from one reservation Indian to another. ▮ Our reading of the federal statutes is consistent with the rule of construction that "'statutes passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians.'" (*Bryan* v. *Itasca County, supra*, at p. 392 [48 L.Ed.2d at p. 723], quoting *Alaska Pacific Fisheries* v. *United States* (1918) 248 U.S. 78, 89 [63 L.Ed. 138, 141, 39 S.Ct. 40].)

The order of the trial court is affirmed.

Taylor, P. J., and Rouse, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 17, 1982.