862 P.2d 428

**JICARILLA APACHE TRIBE,**
Petitioner–Appellant,

v.

**BOARD OF COUNTY COMMISSION-
ERS, COUNTY OF RIO ARRIBA, State
of New Mexico, Respondent–Appellee.**

**Natividad Q. CHAVEZ, Plaintiff–
Appellant,**

v.

**BOARD OF COUNTY COMMISSIONERS
OF RIO ARRIBA COUNTY, Cecilia R.
Valdez, Guadalupe B. Garcia, Harold I.
Romero, Ed Duda, Emilio Naranjo and
John Doe I, John Doe II, and John Doe
III, Defendants–Appellees.**

No. 12098.

Court of Appeals of New Mexico.

July 30, 1993.

Certiorari Granted in 21,476
Sept. 28, 1993.

Certiorari Denied in 21,542 Oct. 26, 1993.

Wayne H. Bladh, Teresa Isabel Leger, Nordhaus, Haltom, Taylor, Taradash & Frye, Santa Fe, H. Vern Payne, Payne & Hall, P.C., Albuquerque, for appellant Jicarilla Apache Tribe.

Patrick A. Casey, Patrick A. Casey, P.A., Santa Fe, for appellant Natividad Q. Chavez.

Dennis Luchetti, Española, for appellees Board of County Com'rs of Rio Arriba County, et al.

OPINION

BIVINS, Judge.

We withdraw the opinion filed on April 27, 1993, and substitute the following.[1]

Petitioner–Appellant Jicarilla Apache Tribe (the Tribe) and Plaintiff–Appellant Natividad Q. Chavez (Chavez), whose suits against Defendants–Appellees, the Board of County Commissioners of Rio Arriba County, et al. (the County), were consolidated below for trial, appeal from the district court's dismissal, after trial, of all Appellants' claims, and the court's determination that a public road by prescription had been established across Appellants' ranches. Four issues are raised on appeal: (1) whether the district court had subject matter jurisdiction to adjudicate the County's claim of a public road by prescription across the Tribe's ranch (raised only by the Tribe); (2) whether the district court properly found that a public road by prescription had been established across Appellants' ranches; (3) whether the district court properly considered evidence of a public road by prescription dating back to the period 1832–81; and (4) whether there was sufficient evidence of County recognition and maintenance of the claimed public road. We reverse as to the Tribe based on the first issue, partially affirm and partially reverse and remand as to Chavez on the second issue, and summarily affirm on the last two issues as they relate to Chavez.

I. *FACTS*

Appellants' causes of action arose when the County sent two road crews to "blade" a road across a ranch contiguous with the Jicarilla Apache Reservation and recently purchased by the Tribe, commonly called the "Theis Ranch," and across a ranch owned by Chavez (the Chavez property). The path followed by the road crews runs from New Mexico Highway 95 (N.M. 95) north to United States Highway 84 (U.S. 84), crossing the east end of the Theis Ranch and running through the center of the Chavez property, which lies to the north of the Theis Ranch.

On the same day in October 1987, the two county blading crews started at opposite ends (north and south) of what the County claims is a public road by prescription. The south crew started near N.M. 95, at the southern boundary of the Theis Ranch, and travelled about 6.5 miles north to the southern boundary of the Willow Creek Ranch, which borders the Theis Ranch to the north, alternately blading, filling arroyos with dirt, installing culverts, digging up trees, and simply driving along a relatively short stretch of already-existing road. The crew was stopped at the northern boundary of the Theis Ranch by the owners of the Willow Creek Ranch, who were not parties to the action below, and are not parties to this appeal. The north crew started at U.S. 84, at the northern boundary of the Chavez Ranch, and alternately drove and bladed their way for about 3.5 miles south to the northern boundary of the Willow Creek Ranch, which borders the Chavez Ranch to the south, where they also were stopped by the owners of the Willow Creek Ranch.

Chavez and the Tribe separately filed suit in the district court of Rio Arriba County very soon after these events. Both petitioned the court to enjoin the County from further activity on their respective ranches, while Chavez additionally requested that damages be awarded, alleging trespass and, in a later amended complaint, uncompensated taking of property, violations of 42 U.S.C. Section 1983 (1988), and negligence. The County, as one of its affirmative defenses, claimed that the disputed road across Appellants' ranches had been used by the public "since time immemorial" and that this use had created a public prescriptive easement.

The Tribe's and Chavez's suits eventually were consolidated, and after a trial, during which a large quantity of evidence was introduced, the district court dismissed all of Appellants' claims. The court ruled that

---

**1.** After the filing of the original opinion on April 27, 1993, Ruben Rodriguez, counsel for the County, withdrew and new counsel entered an appearance.

a public road across Appellants' ranches had been established by prescription.

## II. STATE COURT JURISDICTION OVER THE TRIBE'S DISPUTE WITH THE COUNTY

■ First, we consider the Tribe's jurisdictional claim. On appeal, the Tribe claims that the district court lacked subject matter jurisdiction to adjudicate the dispute between the Tribe and the County. Initially, we note that the district court was never alerted to the jurisdictional issue; in fact, the Tribe stipulated to the court's jurisdiction. Nevertheless, because we conclude that the district court had no jurisdiction to determine whether a public road by prescription had been established across land owned by the Tribe, we reverse on this issue as to the Tribe. *See Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App.1987) (argument not presented to court below will not be considered on appeal unless jurisdictional in nature).

We begin by explaining the timing of the events surrounding the Tribe's purchase of the Theis Ranch. The Tribe purchased the Ranch in June 1985, about two and a half years before the County's blading activities. The Tribe initially filed suit against the County in October 1987, the same month during which the County bladed, but did not deed the Ranch to the United States in trust until the following month, November 1987. The Theis Ranch was accepted in trust by the United States in March 1988, and was formally added to the Tribe's reservation in September 1988.

■ Generally, a state may not exercise authority over Indian affairs if such an exercise would infringe on an Indian tribe's right of self-government or has been preempted by federal law. *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142–43, 100 S.Ct. 2578, 2582–83, 65 L.Ed.2d 665 (1980). *See generally* William C. Canby, Jr., *American Indian Law in a Nutshell* 73–77 (2d ed. 1988) [hereinafter Canby, *American Indian Law*]. Either the "preemption" doctrine or the "infringement" doctrine, standing alone, is suffi-

cient to bar the exercise of state authority. *White Mountain Apache Tribe*, 448 U.S. at 142–43, 100 S.Ct. at 2582–83; *see New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334 n. 16, 103 S.Ct. 2378, 2386 n. 16, 76 L.Ed.2d 611 (1983). New Mexico courts have applied both the preemption and the infringement doctrines to decide the propriety of state court adjudication of disputes involving Indian land. *See, e.g., Chino v. Chino*, 90 N.M. 203, 206, 561 P.2d 476, 479 (1977) (both infringement and preemption barred state court adjudication of interest in land on Mescalero Apache reservation); *Sangre de Cristo Dev. Corp. v. City of Santa Fe*, 84 N.M. 343, 348–51, 503 P.2d 323, 328–31 (1972) (county and municipal control over Tesuque Pueblo land did not infringe on the tribe's self-government, but was preempted, so state court had no jurisdiction), *cert. denied*, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 400 (1973); *Alexander v. Cook*, 90 N.M. 598, 600–02, 566 P.2d 846, 848–50 (Ct.App.1977) (state court had jurisdiction to adjudicate dispute between non-Indians arising on San Ildefonso Pueblo lands because neither infringement nor preemption applied). Because we find preemption in this case, we need not consider infringement.

■ Where Indian tribes are concerned, state action is preempted when it impairs the general thrust of a detailed federal regulatory scheme, *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Eng'g, P.C.*, 476 U.S. 877, 885, 106 S.Ct. 2305, 2310, 90 L.Ed.2d 881 (1986), and "[f]ederal limitations on alienation of Indian property have been so continuous and comprehensive that application of state laws would often impact directly upon the federal government itself." *Cohen's Handbook of Federal Indian Law, supra*, at 274. We specifically point out 28 U.S.C. Section 1360(b) (1988), a partial codification of what is commonly known as "Public Law 280," as a clear indication that such adjudicatory authority "is incompatible with federal ... interests reflected in federal law." *Mescalero Apache Tribe*, 462 U.S. at 334, 103 S.Ct. at 2386.

## A. *Public Law 280*

Enacted in 1953 and amended in 1968, this act is a "mandatory grant" to six states (California, Minnesota, Nebraska, Oregon, Wisconsin, and Alaska (added in 1958)) of extensive civil and criminal jurisdiction over actions and crimes arising in Indian country. These "mandatory" states are listed in the civil and criminal portions of the act and had no choice but to assume the jurisdiction granted by Public Law 280. *See* Canby, *American Indian Law, supra,* at 176–77; *Felix S. Cohen's Handbook of Federal Indian Law* 362 & n. 122 (Rennard Strickland & Charles F. Wilkinson eds., 1982) [hereinafter *Cohen's Handbook of Federal Indian Law* ]. Public Law 280 also gives all other states the option of acquiring such jurisdiction. *See* Canby, *American Indian Law, supra,* at 176–96; *Cohen's Handbook of Federal Indian Law, supra,* at 362; 18 U.S.C. § 1162 (1988); 28 U.S.C. § 1360. New Mexico has not accepted Public Law 280's offer of jurisdiction. *See State v. Warner,* 71 N.M. 418, 422, 379 P.2d 66, 69 (1963). *See generally* Canby, *American Indian Law, supra,* at 192; *Cohen's Handbook of Federal Indian Law, supra,* at 362.

Public Law 280's offer to the states of civil jurisdiction over Indians was codified at 28 U.S.C. Section 1360. Like the offer of criminal jurisdiction, codified at 18 U.S.C. Section 1162, it is very broad. However, an exception exists to the offer of civil jurisdiction. Section 1360(b) states, in pertinent part:

> Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property . . . belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States . . . or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

■ Although Section 1360(b) does not explicitly bar all states from exercising the described jurisdiction—it simply states that

Section 1360(a) does not authorize that jurisdiction—the implication is clear. It makes no sense to deny the powers in Section 1360(b) only to those states granted broad civil jurisdiction by Section 1360(a). Indeed, the Supreme Court in *Bryan v. Itasca County,* 426 U.S. 373, 391, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976) (quoting *Kirkwood v. Arenas,* 243 F.2d 863, 865–66 (1957)), stated that it agreed with the Ninth Circuit Court of Appeals that Section 1360(b) " 'is entirely consistent with, and in effect is a reaffirmation of, the law as it stood prior to [Section 1360's] enactment.' " Thus, if there had been any doubt about the law prior to enactment of Section 1360, Congress clarified the situation by its explicit language in Section 1360(b). In short, Section 1360(b)'s jurisdictional bar does not apply only to states that have been granted, or have assumed, jurisdiction under Public Law 280. Such a narrow construction of Section 1360(b) would violate the canons of construction applicable to statutes concerning Indians, which dictate that all ambiguity in a statute is to be construed in favor of the Indians. *See Bryan,* 426 U.S. at 392, 96 S.Ct. at 2112. Such a construction "would be the construction less consistent with the maintenance of protective federal supervision over Indian land interests and therefore disfavored under [the applicable canons of construction]." *Boisclair v. Superior Court,* 51 Cal.3d 1140, 276 Cal.Rptr. 62, 801 P.2d 305, 313 (1990) (en banc).

### 1. *Applicability of Constraints in Section 1360(b) to the Theis Ranch*

We now consider whether the constraints in Section 1360(b) apply to the Theis Ranch. There is no dispute that the Theis Ranch was "real property belonging to any Indian tribe," at the initiation of this lawsuit. Thus, the question becomes whether the Ranch was "real property subject to a restriction against alienation imposed by the United States" at the outset of the lawsuit.

The United States places restrictions on the alienation of Indian land through 25 U.S.C. Section 177 (1988), the Noninter-

course Act. The Act provides in pertinent part:

No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

See generally Cohen's Handbook of Federal Indian Law, supra, at 510–12.

 Although "[f]ormerly there was some doubt concerning whether land conveyed by purchase to an Indian tribe fell within the protection of the federal government and the restrictions upon alienation attendant to the federal trust relationship," it now is generally accepted that "lands acquired by [a] tribe by purchase [are] subject to federal restraints against alienation." Cohen's Handbook of Federal Indian Law, supra, at 484. See generally id. at 482–83 (discussing the creation of Indian reservations by purchase). Also, "[e]ven land held by a tribe in fee simple[, as opposed to the United States, as trustee for a tribe, holding legal title,] is subject to the statutory restraints against alienation." Id. at 520 (discussing the immunity of Indian lands from certain state-created defenses, and the fact that Indian tribes need not depend on the United States, acting as trustee, to assert this immunity).

United States v. Candelaria, 271 U.S. 432, 46 S.Ct. 561, 70 L.Ed. 1023 (1926), involved lands of the Laguna Pueblo, and directly addressed the applicability of the Nonintercourse Act's restrictions to Indian lands held in fee simple by a tribe. The Court relied heavily on United States v. Sandoval, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913), in finding that the Act applied to the Laguna lands. Candelaria, 271 U.S. at 439–42, 46 S.Ct. at 562–63; see Sandoval, 231 U.S. at 48, 34 S.Ct. at 6 (Santa Clara Pueblo lands "subject to the legislation of Congress enacted in the exer-

cise of the Government's guardianship over those tribes and their affairs," despite fact that Pueblo Indians held fee simple title to lands). The Court recognized, as had the Sandoval Court, that Pueblo Indians hold their land in fee simple, but despite this fact stated that "[t]he Indians of the pueblo are wards of the United States, and hold their lands subject to the restriction that the same cannot be alienated in any wise without its consent." Candelaria, 271 U.S. at 443, 46 S.Ct. at 563.[2]

Since Sandoval and Candelaria, lower federal courts have consistently stated that the form of an Indian tribe's title, or the manner in which the tribe acquired title, does not affect the applicability of the Nonintercourse Act to the lands in question. See, e.g., Alonzo v. United States, 249 F.2d 189, 191, 196 (10th Cir.1957) (in a dispute involving non-trust lands held by the Laguna Pueblo in fee simple, the court was of the opinion that the Nonintercourse Act restrictions applied even to land acquired by purchase), cert. denied, 355 U.S. 940, 78 S.Ct. 429, 2 L.Ed.2d 421 (1958); 7,405.3 Acres of Land, 97 F.2d at 418–19, 422 (fact that lands in question were originally obtained by purchase, and did not become trust land until fifty years later, was irrelevant to the Cherokee Tribe's status as wards of the United States and to the applicability of the Nonintercourse Act to the lands (citing Candelaria and Sandoval)); cf. Narragansett Indian Tribe v. RIBO, Inc., 686 F.Supp. 48, 51 (D.R.I.1988) (applying 25 U.S.C. Section 81 (1988), a federal statute limiting an Indian tribe's capacity to contract, to non-trust lands held in fee simple by the Narragansett Tribe, the court analogized to the Nonintercourse Act and found Section 81 applicable to lands acquired by purchase (citing Alonzo, 249 F.2d at 196)).

The Tribe has the same "ward-guardian" relationship with the United States as do

---

**2.** We note that the Candelaria Court ultimately held that the New Mexico court properly adjudicated title to the Indian lands in question. At the time of the adjudication, however, a New Mexico statute authorized Pueblo Indians to bring suit in territorial courts. See § 53–9–1

(Repl.Pamp.1983). In 1924, Congress divested New Mexico courts of the power to adjudicate any "right, title, or interest in or to the lands of the Pueblo Indians of New Mexico." Pueblo Lands Board Act, ch. 331, 43 Stat. 636, 641 (1924).

other Indian tribes, and the Tribe's land merits the same level of federal protection as the land of other tribes. Under federal case law, these facts indicate that the Theis Ranch became subject to federal restrictions against alienation under the Nonintercourse Act when it was purchased in fee simple by the Tribe in June 1985, and was subject to these restrictions at the initiation of this lawsuit. Consequently, the Ranch was covered by the constraints in Section 1360(b) at the initiation of the lawsuit.

### 2. Section 1360(b) as a Bar to State Court Jurisdiction over the Challenged Public Road

The high courts of at least two "mandatory" Public Law 280 states, California and Alaska, have found Section 1360(b) to be a bar to state court adjudication of interests in Indian land. See Ollestead v. Native Village of Tyonek, 560 P.2d 31 (Alaska), cert. denied, 434 U.S. 938, 98 S.Ct. 426, 54 L.Ed.2d 297 (1977); Boisclair, 801 P.2d at 315. Boisclair is particularly useful in analyzing the jurisdictional issue in the instant appeal. As in this appeal, a major issue in Boisclair was the jurisdiction of a state court to adjudicate the existence of an easement or a public road over property claimed to be Indian land. Boisclair, 801 P.2d at 307. The Boisclair court analyzed the historical context of Section 1360, particularly the evolution of the preemption and infringement tests for state court jurisdiction, id. at 309–10, and the legislative history and intent of the Section, id. at 310–11. It concluded that "[S]ection 1360(b) precludes states from asserting jurisdiction over disputes concerning Indian land, including—as here—disputes in which one party claims the disputed property is non-Indian." Id. at 312. The court then applied to Section 1360(b) the specialized canons of construction used to construe statutes concerning Indians, id. at 312–13, and stated: "As long as the Indian party to the litigation claims that the property is Indian trust or allotted land, the dispute may be characterized as one concerning ownership and possession of Indian land, and is therefore barred from state court jurisdiction [by Section 1360(b)]." Id. at

314. Although Boisclair concerned what was claimed to be trust land, Section 1360(b), by its own terms, clearly applies both to trust land and to land subject to alienation restrictions, as is the Theis Ranch. See Section 1360(b).

The Supreme Court of Alaska also has stated that Section 1360(b) is a jurisdictional bar. See Ollestead, 560 P.2d at 34. Ollestead concerned the jurisdiction of the Alaska state courts to decide membership in an Indian tribe. Although the main issue in that case was whether deciding membership in a tribe amounted to adjudicating an interest in Indian land, the court stated, without citing supporting authority other than the statute itself, that "Subsection 1360(b) precludes state courts from adjudicating the ownership or right to possession of property or an interest therein belonging to an Indian tribe or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States." Id.

The Supreme Court of Washington, another mandatory Public Law 280 state, has held that, under Section 1360(b), state administrative agencies had no "jurisdiction" to encumber Indian lands by applying state zoning ordinances to such lands. Snohomish County v. Seattle Disposal Co., 70 Wash.2d 668, 425 P.2d 22, 25–26 (en banc), cert. denied, 389 U.S. 1016, 88 S.Ct. 585, 19 L.Ed.2d 662 (1967). Federal courts have held that Public Law 280 does not require application of state statutes of limitation where the dispute involves Indian trust land, Capitan Grande Band of Mission Indians v. Helix Irrigation Dist., 514 F.2d 465, 467–69 (9th Cir.), cert. denied, 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975), and that Section 1360 does not confer to local county and municipal governments jurisdiction over Indian land. Santa Rosa Band of Indians v. Kings County, 532 F.2d 655, 662–63 (9th Cir.1975), cert. denied, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977); see also State Dep't of Public Works v. Agli, 472 F.Supp. 70, 73–74 (D.Alaska 1979) (Public Law 280 bars state courts from adjudicating equitable interests in a Native allotment in a quiet title

action or action for ejectment); *In re Humboldt Fir, Inc.*, 426 F.Supp. 292, 295–96 (N.D.Cal.1977) (neither *Bryan* nor Section 1360 confer jurisdiction on state courts where the dispute directly involves the use of Indian property), *aff'd*, 625 F.2d 330 (9th Cir.1980).

Given the case law discussed above, the applicability of the Nonintercourse Act to the Theis Ranch, and the last sentence of Section 1360(b), stating that Public Law 280 shall not "confer jurisdiction upon the State to adjudicate ... any interest [in real property subject to federal alienation restrictions]," the district court was barred from adjudicating real property interests in the Theis Ranch.

### B. *Waiver of Jurisdictional Argument, Conferral of Jurisdiction, and Lack of Adjudication of an Interest in Indian Land*

■ On appeal, the County responds to the Tribe's jurisdictional arguments by claiming that: (1) because the Tribe brought suit and stipulated to the district court's jurisdiction early on in the lawsuit, (a) it has waived the right to raise a jurisdictional argument on appeal, and (b) it conferred jurisdiction on the district court; and (2) because the district court was simply "recognizing a pre-existing interest" in the Theis Ranch when it found a public road by prescription, it was not adjudicating an interest in Indian land, and therefore had jurisdiction.

The issue here is *subject matter* jurisdiction. *See Kennerly v. District Court*, 400 U.S. 423, 428–30, 91 S.Ct. 480, 482–83, 27 L.Ed.2d 507 (1971) (even consent by vote of tribal council to concurrent jurisdiction of state does not allow state to exercise jurisdiction absent formal assumption of jurisdiction pursuant to Public Law 280); *Nelson v. Dubois*, 232 N.W.2d 54, 56–57 (N.D. 1975) (consent by Indian insufficient to confer jurisdiction), *disavowed by Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Eng'g, P.C.*, 364 N.W.2d 98, 104 (N.D.1985), *disavowal vacated by Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Eng'g, P.C.*, 392 N.W.2d 87, 87 (N.D.1986); Robert J. Wagoner, *The Subject Matter Jurisdiction of New Mexico District Courts Over Civil Cases Involving Indians*, 15 N.M.L.Rev. 75, 77–80 (1985); Canby, *American Indian Law, supra*, at 1–3, 146; William C. Canby, Jr., *Civil Jurisdiction and the Indian Reservation*, 1973 Utah L.Rev. 206, 221 & n. 115; *Cohen's Handbook of Federal Indian Law, supra*, at 281–82. Thus, the Tribe neither waived the appellate jurisdictional issue, *see Zarges v. Zarges*, 79 N.M. 494, 497, 445 P.2d 97, 100 (1968) ("Under ordinary circumstances a party is not permitted to take a position in the court below and, thereafter, to take a contrary position on appeal. However, the rule is otherwise when jurisdiction is involved."), nor conferred jurisdiction on the district court, *see Chavez v. County of Valencia*, 86 N.M. 205, 209, 521 P.2d 1154, 1158 (1974); *State v. Begay*, 105 N.M. 498, 499, 734 P.2d 278, 279 (Ct.App.1987) (subject matter jurisdiction may be raised at any time), when it stipulated to the jurisdiction of the district court. Although neither party raises the issue of sovereign immunity on appeal, we nevertheless note that, even if we found that the Tribe waived its sovereign immunity, our jurisdictional analysis still would compel reversal of the district court on jurisdictional grounds. "Mere consent to be sued, even consent to be sued in a particular court, does not alone confer jurisdiction upon that court to hear a case if that court would not otherwise have jurisdiction over the suit." *Weeks Constr., Inc. v. Oglala Sioux Hous. Auth.*, 797 F.2d 668, 671 (8th Cir.1986) (federal district court had no jurisdiction to hear breach of contract claim by non-Indian against tribal agency despite express waiver of sovereign immunity by tribe); *see R.C. Hedreen Co. v. Crow Tribal Hous. Auth.*, 521 F.Supp. 599, 606–07 & n. 4 (D.Mont.1981) (waiver of sovereign immunity meant that tribal agency could be sued in state court because it was a court of competent jurisdiction), *disagreed with on other grounds by R.J. Williams Co. v. Fort Belknap Hous. Auth.*, 719 F.2d 979, 985 (9th Cir.1983).

The County's reliance on *Paiz v. Hughes,* 76 N.M. 562, 417 P.2d 51 (1966), is misplaced. In *Paiz,* the Supreme Court explicitly made an Indian's right to seek redress in state court subject to the state court's jurisdiction under the infringement test. *Id.* at 665–66, 417 P.2d at 53–54. *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, P.C.,* 467 U.S. 138, 148–49, 104 S.Ct. 2267, 2274, 81 L.Ed.2d 113 (1984), on which the County also relies, is similarly inapplicable to the instant appeal. *Three Affiliated Tribes* concerned an action for negligence and breach of contract arising out of the building of a water system on a reservation. *Id.* at 141, 104 S.Ct. at 2270. It did not concern the adjudication of an interest in Indian land.

The County also argues that, because the claimed public road by prescription over the Tribe's land "ripened" before the Tribe bought the land, and because the district court was simply recognizing this already existing interest, the district court was not adjudicating an interest in Indian land and, thus, had jurisdiction. The County's argument begs the question. The issues of whether a prescriptive public road existed over the Tribe's land, and when the public's prescriptive right ripened, both are irrelevant to the jurisdictional question. Those issues are important *only after jurisdiction is established.*

■ The only pertinent jurisdictional inquiry concerning the public road by prescription alleged here is whether the road is an interest in Indian land. A claimed public road by prescription traversing Indian land is such an interest. *See Boisclair,* 801 P.2d at 307–08, 315 (where the dispute involved what the non-Indian party claimed was either an easement or a public road, on what all parties conceded was Indian land, Section 1360(b) applied).

■ Moreover, the jurisdictional inquiry is not concerned with the merits of a dispute involving Indian land, including the question of whether Indian land is *actually* involved. This inquiry is concerned only with whether Indian land is *alleged* to be involved. As the *Boisclair* court wrote:

Thus, it makes no difference if [the non-Indian party] claims that the land is owned by himself, by the state, or is under state jurisdiction by virtue of federal government action. As long as the Indian party to the litigation claims that the property is Indian trust or allotted land, the dispute may be characterized as one concerning ownership and possession of Indian land, and is therefore barred from state court jurisdiction.

*Id.* at 314. As reasoned by the *Boisclair* court, given the intent of Section 1360(b) to preserve federal control over Indian land, it is better that some cases be "initially and temporarily shunted into federal court, because of erroneous claims that the land in question is Indian ... land," *id.* at 313, than for cases actually involving Indian land to be erroneously decided by state courts. *See id.* at 313–14; *id.* at 315 (if it appears from the totality of the pleadings that " 'ownership or right to possession [of Indian land] or any interest therein' " is involved, the state court must dismiss for lack of subject matter jurisdiction (quoting Section 1360(b) (modification in the original)).

C. *Conclusion of Jurisdictional Analysis*

We hold that the district court in this case had no jurisdiction to adjudicate the existence of a claimed public road by prescription across the Theis Ranch. Thus, we reverse the court's decision that such a road existed across the Tribe's land.

III. *EXISTENCE OF A PUBLIC ROAD BY PRESCRIPTION OVER THE CHAVEZ PROPERTY*

In view of our disposition of Appellants' first issue, we analyze the second issue only as it applies to Appellant Chavez and her property. On appeal, Chavez claims that the district court improperly found that a 500–foot–wide public road had been established over her property by prescription. She argues that: (1) the evidence of actual use of the claimed road was insufficient to establish a public road by prescription; (2) there was insufficient evidence

that the use of the road was adverse; (3) any prescriptive public road has been abandoned by nonuse; (4) there was insufficient evidence that the road was 500 feet wide; and (5) the court failed to make a specific finding on the location of the road. We affirm on all but the last two issues. We reverse on those issues and remand to the district court for a redetermination of the width of the public road across the Chavez property, and a determination of, and findings on, the location of the road.

1. *Actual Use of the Road*

■ In order to prevail on its claim of a public road by prescription, the County was required to prove that there was open, uninterrupted, peaceable, notorious, adverse, and continuous use of the Chavez property by the public, under claim of right, for a period of ten years, with Chavez's actual or imputed knowledge. *See Village of Capitan v. Kaywood*, 96 N.M. 524, 525, 632 P.2d 1162, 1163 (1981) (elements of public right-of-way by prescription). At trial, the County introduced evidence falling into three basic categories: exhibits and accompanying expert testimony, reputation testimony, and firsthand testimony about actual use of the road.

A plethora of exhibits, including maps, surveys, and aerial photographs showing the claimed road, and deeds referring to the road, were introduced into evidence. These exhibits, and the accompanying expert testimony linking the roads in the exhibits with the road in issue at trial, indicate the location and existence of a more or less travelled pathway across the Chavez property.

As Chavez correctly points out, this evidence proves little about the character of the actual use of the road. *See Luchetti v. Bandler*, 108 N.M. 682, 686, 777 P.2d 1326, 1330 (Ct.App.) (evidence of prescriptive easement found insufficient—while exhibit depicted existence of trail road, appellant did not cite to testimony establishing open, notorious, peaceable, and uninterrupted use), *cert. denied*, 108 N.M. 681, 777 P.2d 1325 (1989); *cf. Sanchez v. Dale Bellamah Homes of New Mexico, Inc.*, 76 N.M. 526,

529–30, 417 P.2d 25, 28 (1966) (depiction of road on U.S.G.S. map only one factor in charging landowner with knowledge of use of road; court also considered evidence of size of tract, populated nature of surrounding area, and visibility of road). However, these exhibits and their accompanying expert testimony show that a pathway across the Chavez property existed and exists, and that it has been used by vehicles, and possibly by livestock.

The County also presented testimony about the reputation of the road in issue as a public road. This testimony indicated that the claimed road was regarded by area residents as a "public road," "community road," or "county road," that it had been so regarded for many years, and that the public used the road. This testimony supported the general proposition that the road was open to the public.

Of particular interest was the admission by Frank Chavez, the husband of Natividad Chavéz, that he read and signed in March 1985 an affidavit stating that the livestock driveway through the Chavez property was known as the "old Dulce road" and had "been open to transport or have driven or trailed all kinds of livestock thru this 'Callejon' (alley) for as long as I can remember." Mr. Chavez was born in 1911. In the same vein, Ed Duda, the County Road Superintendent, testified that, when the County bladed the road, Frank Chavez told him where the road was located and said, "I came out here to make sure you were on the county road."

In addition, the County put on a procession of witnesses who testified about specific instances of their own use of the road, and specific instances of use by others in the community. This testimony indicated that the road was used primarily for moving cattle and sheep, but that it also was used for hunting, wood gathering, driving horse-drawn wagons, horseback riding, and driving motor vehicles. It also indicated that the public used the road whenever necessary or convenient. Testimony about motor vehicles using the road consisted of one witness's testimony about two or three trips in a Model T truck for livestock tend-

ing purposes in about 1928, another's testimony about travelling "quite a bit" in a Model A Ford in the 1930s to visit a relative, and a third witness's testimony about use of a truck from 1933–43, in conjunction with cattle drives. A fourth witness testified about motor vehicles exiting from the road. Most of the witnesses who testified that they used the road also testified that they did not seek permission from anyone and that no one ever tried to stop them.

After hearing all the evidence, the district court found that "the road in question has been used by the public to drive sheep, cattle, horses, and for pleasure, and has been used by horse-drawn wagons and motor vehicles since time immemorial." It also found that "the roadway in question was used by the general public as a public highway prior to 1832, and has continued to be so used since," and that "[the County] proved the establishment of a public road by prescription." The court then concluded that "the road in question is a public road" and that "the public has established a public right-of-way by usage."

 On appeal, we decide whether substantial evidence supports the district court's determination that each element required to establish a public road by prescription was proved by clear and convincing evidence. *See Scholes v. Post Office Canyon Ranch, Inc.*, 115 N.M. 410, 411, 852 P.2d 683, 684 (Ct.App.) (we review by determining whether each element of prescriptive easement proved by clear and convincing evidence), *cert. denied*, 114 N.M. 123, 835 P.2d 839 (1992); *Luchetti*, 108 N.M. at 685–86, 777 P.2d at 1329–30 (despite some evidence of easement, trial court could properly determine that party with burden of persuasion had not satisfied its burden); *Wilson v. Williams*, 43 N.M. 173, 175, 87 P.2d 683, 684–85 (1939) (finding of public road by prescription over public land remained undisturbed on appeal because sustained by substantial evidence). We consider only the evidence favorable to the district court's findings, and do not resolve conflicts in the evidence or determine the credibility of witnesses. *Luchetti*, 108 N.M. at 685, 777 P.2d at 1329.

 We hold that substantial evidence supports the district court's finding that a public road by prescription was established across the Chavez property. Chavez's main quarrel with the sufficiency of the evidence in this case is that much of the evidence went to use of the road to move livestock. She argues that such evidence cannot suffice to establish a public road. While there was more testimony about use of the road for moving livestock than about other uses, a large quantity of evidence was presented indicating that the public used the road for many of the other purposes for which a rural public road typically is used. The fact that one type of use was more prevalent than other uses does not defeat the County's claim of a public road by prescription.

Chavez also argues that, because the County's evidence did not focus on any specific ten-year period of use, the evidence failed to establish a public road by prescription. It is true that the witnesses did not all testify about the same ten-year period, and that none of the witnesses testified to daily or even weekly use of the road. However, their testimony, together with the reputation testimony and the other evidence, was such that a reasonable mind might accept it as adequate support for the conclusion that the public used the road whenever convenient or necessary for longer than the required ten-year period. *See Register v. Roberson Constr. Co.*, 106 N.M. 243, 245, 741 P.2d 1364, 1366 (1987) (definition of substantial evidence).

### 2. *Adverse Use of the Road*

 Chavez argues that the "neighbor accommodation exception" created a presumption that use of the road during the prescriptive period was permissive. She further claims that the County was required to overcome this presumption by showing that the public use of the road was adverse and under claim of right. *See Castillo v. Tabet Lumber Co.*, 75 N.M. 492, 494, 406 P.2d 361, 362 (1965). Under the exception, the common presumption that use of a claimed prescriptive easement is adverse and under claim of right gives way

to a presumption of permissive use. The exception applies when the claimed easement " 'traverses large bodies of open, unenclosed, and sparsely populated privately-owned land.' " *Scholes*, 115 N.M. at 412, 852 P.2d at 685 (quoting *Village of Capitan*, 96 N.M. at 525, 632 P.2d at 1163).

We hold that the district court reasonably could find that the exception did not apply in this case. There was evidence that a visible road crossed the Chavez property, that the community regarded it as a public road, and that the community used the road when necessary or convenient. The district court reasonably could infer that Chavez and Samuel Sanchez, her uncle and predecessor in interest, knew or reasonably could have known of the public's use of the claimed road. *See Maestas v. Maestas*, 50 N.M. 276, 279–80, 175 P.2d 1003, 1006 (1946) (neighbor accommodation exception applies only where owners of land could not reasonably know of passings over the land); *Scholes*, 115 N.M. at 412, 852 P.2d at 685 (same).

We acknowledge that the neighbor accommodation exception encourages good relations between neighbors in rural areas, and that "some awareness of use must be contemplated in furthering the goal of 'advanc[ing] friendly relations, good neighborliness and sociability between people living in sparsely settled or rural areas.' " *Id.* at 413 n. 2, 852 P.2d at 686 n. 2 (quoting *Castillo*, 75 N.M. at 495, 406 P.2d at 363); *see* Walter D. Daniels, *The Best 84 Years of My Life* 94 (1991) (the author, speaking of ranch life in Mora County in the 1920s, writes: "Everybody was free to get on a horse or in a wagon and travel any direction across the neighbors [sic] ranch. A person could even drive a bunch of cattle across without asking permission."). However, the evidence presented at trial supported an inference that Chavez's knowledge rose above the awareness of use necessary to be a good neighbor, and came to the level of an awareness that the public was claiming a permanent right to cross her property. *See Scholes*, 115 N.M. at 413, 852 P.2d at 686.

Because the neighbor accommodation exception did not apply to this case, use of the road during the prescriptive period was presumed to have been adverse and under claim of right, and the burden was on Chavez to overcome the presumption. *See Sanchez*, 76 N.M. at 529, 417 P.2d at 27 (proof of open, notorious, continuous, and uninterrupted use raises presumption of adverseness and claim of right). She claims that evidence of locked gates across the road since 1965 overcame this presumption. However, the evidence concerning gates was unclear and conflicting. *See Luchetti*, 108 N.M. at 685, 777 P.2d at 1329 (this Court does not weigh conflicting evidence).

### 3. *Abandonment of the Road*

Chavez also claims that, even if a public road by prescription was established, it was abandoned by nonuse. Even if it is true, as claimed by Chavez, that abandonment may be shown by proof of nonuse for the prescriptive period, *see Bennett v. Nations*, 49 N.M. 389, 394–95, 164 P.2d 1019, 1022–23 (1945); 2 George W. Thompson, *Commentaries on the Modern Law of Real Property* § 443, at 731–32, 744–45 (1980), the burden at trial was on Chavez to produce evidence of abandonment. *See id.* at 740. She points us to no evidence of abandonment other than an alleged thirty-year gap between the dates of some maps introduced by the County and the dates of "credible evidence" of County maintenance of the road. As discussed above, maps and evidence of County maintenance were not the only evidence of use of the road.

### 4. *Width of the Road*

The district court found that "the road in question, historically, has been as much as 500 feet wide, and the historical width is the width of the road." Chavez claims that there was insufficient evidence to support this finding. We agree. Neither party has pointed us to any evidence supporting the figure of 500 feet, nor are we aware of any.

Indeed, the court's finding, on its face, indicates a misapplication of the

law. The statement that the road had been "as much as 500 feet" implies that the court found that the road's maximum width in the past had been 500 feet. The court then set the current width of the public road at this "historical width." However, in New Mexico, the width of a public road by prescription is not conclusively established by the road's maximum historical width. While the general rule is that the width of a prescriptive easement is determined by the uses to which the easement was put during the prescriptive period, *see Maloney v. Wreyford*, 111 N.M. 221, 225, 804 P.2d 412, 416 (Ct.App.1990), the width of a public road by prescription is "the width reasonably necessary for public travel." *State ex rel. Baxter v. Egolf*, 107 N.M. 315, 318, 757 P.2d 371, 374 (Ct.App. 1988). The maximum historical width of a road is not necessarily the "reasonably necessary" width.

When determining what width is reasonably necessary for public travel, a trial court should consider all relevant facts and circumstances peculiar to the case. *See Memmott v. Anderson*, 642 P.2d 750, 754 (Utah 1982); *Primark, Inc. v. Burien Gardens Assocs.*, 63 Wash.App. 900, 823 P.2d 1116, 1122 (1992). Where one of the uses establishing a public road by prescription is the driving of livestock, the reasonably necessary width of the road may be much narrower than the width of the entire passageway used by the livestock. *See Montgomery v. Somers*, 50 Or. 259, 90 P. 674, 678 (1907) (trial court's limitation of width to maximum of 60 feet, rather than 75– to 100–yard passageway travelled by loose sheep being driven across land, affirmed); *Deseret Livestock Co. v. Sharp*, 123 Utah 353, 259 P.2d 607, 609–10 (1953) (trial court's finding of 100–foot width, rather than 2,000 feet used for driving and grazing sheep, affirmed); *Bishop v. Hawley*, 33 Wyo. 271, 238 P. 284, 286–87 (1925) (width of 100 feet upheld despite claim that width of 500 feet to a quarter mile used for driving livestock). Mere convenient use of a wide passageway for driving livestock, where use of the claimed public road does not *require* the entire passageway, does not suffice to establish the width of the

claimed road as the width of the entire livestock passageway. *See Montgomery*, 90 P. at 676, 678 (road used for "all kinds of public travel," and 75– to 100–yard width claimed necessary for sheep driving held broader than necessary); *Deseret Livestock Co.*, 259 P.2d at 609–10 (2000–foot width too broad where only 100 feet used for purposes other than driving livestock, and where other cases found only 100 feet reasonably necessary for livestock driving); *Bishop*, 238 P. at 286–87 (use by livestock that is convenient and advantageous not conclusive of width unless also reasonably necessary).

We hold that the district court erred in finding that the public road established by prescription across the Chavez property is 500 feet wide. Accordingly, we reverse and remand to that court for a redetermination of the width of the road.

5. *Location of the Road*

Chavez, relying on *Wilson*, 43 N.M. at 175–76, 87 P.2d at 684–85, also claims that the district court erred in not making a finding on the precise location of the road. While we do not read *Wilson* as requiring absolute precision in locating prescriptive easements, we agree with the gist of Chavez's argument, that the district court did not sufficiently identify the location of the road in its findings. The court's findings refer to many maps that show the road, documents that refer to the road, and photos that show the visible pathway across the Chavez property. The court also found that "the road [is] in substantially the same location as … in previous years." The court failed, however, to make a specific finding on the definite location of the road's boundaries. Judging from the court's findings, the visible pathway, the "beaten path," across the Chavez property could lie anywhere within the adjudged public road easement.

The district court was required to make specific findings on the location of the boundaries of the public road established across the Chavez property. *See* SCRA 1986, 1–052(B)(1) (Repl.1992) (district

court must make findings on ultimate facts); *Lovvorn v. Salisbury*, 701 P.2d 142, 144 (Colo.Ct.App.1985) (trial court required to define width and location of public road by prescription); *DeTevis v. Aragon*, 104 N.M. 793, 800, 727 P.2d 558, 565 (Ct.App. 1986) (trial court must adopt findings of fact resolving material issues, if requested). Since the district court failed to do so, we also reverse on this issue and remand so that the court can determine, and make specific findings on, the location of the public road. In defining the boundaries of the road, the court should refer to fixed and obvious landmarks, or order that a survey be done and refer to that survey, or use some other, similarly definite method of locating the road.

### IV. *DISTRICT COURT'S CONSIDER-ATION OF EVIDENCE DATING BACK TO 1832–81, AND SUFFICIENCY OF EVIDENCE OF COUNTY RECOGNITION AND MAINTENANCE OF THE ROAD*

We dispose of the last two issues raised on appeal summarily, and only as they apply to Chavez. First, Chavez claims that the district court did not have "jurisdiction" to consider evidence of a public road by prescription that dated back to the period 1832–81. The great weight of the evidence on which we rely on in our sufficiency-of-the-evidence analysis, above, dates from the early twentieth century and after. Thus, we conclude that the evidence of use of the road after 1881 was sufficient to establish a public road by prescription across the Chavez property. As a result, we need not address this claim.

 Second, Chavez claims that there was insufficient evidence of County recognition and maintenance of the road, maintaining that "[a] public road cannot be established by public use alone; in addition to proof of actual use ... the County must prove it has lawfully recognized and maintained the claimed road as a public highway." While evidence of County recognition and maintenance certainly is evidence of the public nature of a claimed road, it is not essential to the establishment of a pub-

lic road by prescription. *See Village of Capitan*, 96 N.M. at 525, 632 P.2d at 1163 (public right-of-way established if requirements of private prescriptive easement met by the public). Thus, we find no merit in this claim.

### V. *CONCLUSION*

We reverse as to the Tribe based on the district court's lack of subject matter jurisdiction. We reverse as to Chavez because the court erred in establishing the width of the public road by prescription across the Chavez property at 500 feet, and because the court erred in failing to make a specific finding on the location of the road. We remand for a redetermination, consistent with this opinion, of the width of the road, and so that the district court can determine, and make specific findings on, the location of the road.

IT IS SO ORDERED.

APODACA and HARTZ, JJ., concur.