883 P.2d 136

**JICARILLA APACHE TRIBE,**
**Petitioner–Respondent,**

v.

**BOARD OF COUNTY COMMISSIONERS,**
**COUNTY OF RIO ARRIBA, State of**
**New Mexico, Respondent–Petitioner.**

**No. 21476.**

Supreme Court of New Mexico.

Sept. 28, 1994.

Rehearing Denied Oct. 19, 1994.

Dennis Luchetti, Espanola, for petitioner.

Nordhaus, Haltom, Taylor, Taradash & Frye, Wayne H. Bladh, Santa Fe, for respondent.

*OPINION*

MONTGOMERY, Chief Justice.

This case involves the subject of federal Indian law. We discuss the subject with some trepidation, given the considerable body of federal statutes and the vast array of sometimes confusing cases surrounding the subject. Nevertheless, the issue in the case, as the parties stressed at oral argument, is a quite narrow one; and its resolution directly affects a matter in which the appellate courts of this state are vitally interested—the jurisdiction of our trial courts to resolve disputes between or among citizens of the state and arising out of state-law principles affecting interests in real property located here.

The issue is whether a federal statute, 28 U.S.C. § 1360(b) (1988) (part of what is commonly known as Public Law 280[1]), deprives a state court of subject-matter jurisdiction to adjudicate a dispute between an Indian tribe and one of the state's counties concerning the existence of a public road across part of a ranch purchased by the tribe in the recent past. The issue arose after the Jicarilla Apache Tribe (the Tribe) brought suit in the District Court of Rio Arriba County against the Rio Arriba County Board of County Commissioners (the County), to enjoin certain roadwork by the County on a claimed roadway. The County asserted that the roadway was a public road arising from prescriptive use by the public for a period of many years and that the Tribe took subject to the road when it acquired the ranch, which at that time was adjacent to—not a part of—its reservation. The Tribe and the County litigated the public-use question in district court, and the court ruled in the County's favor after a seven-day bench trial. The Tribe appealed to the New Mexico Court of Appeals on a number of grounds, including the ground—which was raised for the first time on appeal—that the district court lacked subject-matter jurisdiction to resolve the parties' dispute. The Court of Appeals reversed the district court, holding that the trial court lacked jurisdiction to adjudicate the existence of a claimed public road across the ranch. *Jicarilla Apache Tribe v. Board of County Comm'rs*, 116 N.M. 320, 329, 862 P.2d 428, 437 (Ct.App.), *cert. granted*, 117 N.M. 524, 873 P.2d 270 (1993). We granted the County's petition for a writ of certiorari to consider this jurisdictional question. We reverse the Court of Appeals' decision and hold that federal law did not preempt the district court's exercise of jurisdiction to resolve the parties' dispute.

I.

The Jicarilla Apache Tribe occupies a reservation in northern New Mexico. Established by Executive Order in 1887, the reservation encompasses over 740,000 acres, not including the ranch that is the subject of this dispute. The Tribe conducts significant commercial activities on the reservation, including a substantial amount of elk and deer hunting. In 1985 it decided to expand the area devoted to commercial hunting by purchasing a 55,000–acre ranch (the Theis

---

1. Public Law 280 was enacted as ch. 505, §§ 2–7, 67 Stat. 588–90 (1953). Section 4 of Public Law 280 is codified as 28 U.S.C. § 1360.

Ranch) adjoining its reservation on the east.[2] The Theis Ranch lies entirely within Rio Arriba County and consists of largely uninhabited land that is now used primarily for some of the commercial hunting conducted by the Tribe.

In November 1987, after this suit was filed,[3] the Tribe conveyed the property to the United States in trust for itself. The Secretary of the Interior accepted the conveyance in March 1988 and in September of that year formally added the property to the Jicarilla Apache Reservation.

In October 1987 a County road crew began blading a roadway across the Theis Ranch, starting at a point where its southerly boundary intersects State Road 95 and proceeding in a northerly direction toward the town of Monero, approximately eighteen miles to the northwest. Simultaneously, County employees began blading from the north across a 4,732–acre ranch owned by a neighbor, Natividad Chavez, lying to the north of the Theis Ranch.[4]

The Tribe and Chavez independently filed suit in the district court to enjoin the County from continuing to blade the roadway across their respective ranches. The suits were eventually consolidated. The County asserted that the area it wanted to blade was a preexisting road that had been used by the public since early in the nineteenth century and that it held a prescriptive easement over the road. The Tribe and Chavez challenged the extent of any such use and denied that any easement existed. The court received voluminous evidence describing the condition of the road, and demonstrating its prescriptive use, since at least the early part of this century. As the Court of Appeals said in its opinion below with reference to the portion of the road crossing the Chavez Ranch (but, according to the trial court's findings, with equal application to the portion crossing the Theis Ranch), "[the trial] testimony indicated that the road was used primarily for moving cattle and sheep, but that it also was used for hunting, wood gathering, driving horse-drawn wagons, horseback riding, and driving motor vehicles. It also indicated that the public used the road whenever necessary or convenient." 116 N.M. at 330, 862 P.2d at 438.

In addition, there was evidence of active County involvement in maintaining the road: County employees testified that they remembered working on the road as early as 1960 and as recently as 1985; a road maintenance schedule listed the road as "County Road 335"; and the County Commissioners discussed repairs to the road at meetings as far back as 1931. Other evidence included United States Geological Survey aerial photographs and National Forest maps showing the roadway—some describing it as a "good motor road"—and numerous other maps and deeds referring to the road throughout the present and the latter part of the last century. Currently, the segment of the road that traverses the Theis Ranch is bounded on both sides by fences that are 300 feet apart along some portions of the road.

After receiving all the evidence, the trial court made numerous detailed findings of fact, declaring that "the road in question has been used by the public to drive sheep, cattle, horses, and for pleasure, and has been used by horse-drawn wagons and motor vehi-

2. The ranch was acquired by a warranty deed from the Theis Company, a Kansas partnership, dated June 21, 1985, which was duly recorded in the Rio Arriba County Clerk's office. It described the property by metes and bounds and contained numerous "subject to" clauses listing various exceptions, reservations, easements, and conditions to which the property was subject. The ranch originally was part of the Tierra Amarilla Land Grant, which the trial court found was confirmed by Congress in 1860 and patented by the United States Government to one Francisco Martinez in 1881.

3. It is undisputed that the jurisdictional question in this case turns on the status of the land in October 1987, when the litigation began. (In its response to the County's petition for certiorari, the Tribe stated: "The jurisdictional question decided by the court of appeals turned on the status of this land in October 1987 when the litigation was commenced.") At that time the ranch was owned by the Tribe in fee simple, subject to the exceptions set out in the Tribe's deed and, as discussed later in this opinion, to federally imposed restrictions against alienation.

4. Another ranch, the Willow Creek Ranch, lay between the Theis Ranch and the Chavez Ranch. The owner or owners of the Willow Creek Ranch were not parties to the action below.

cles since time immemorial"; that "the roadway in question has existed for many years, and at least since the 1820's, in its present location"; and that "the Plaintiffs and their predecessors in interest have had knowledge of the existence and use of the road in question." [5] The court concluded that the road was a public road, the public having established a right of way by prescriptive use for the necessary period. Having so concluded, the court dismissed the Tribe's and Chavez's petitions with prejudice.

The Tribe and Chavez filed a joint appeal. The Court of Appeals affirmed with respect to Chavez's property, overruling her claims that the evidence was insufficient to establish a public road by prescription. *Id.* at 330–32, 862 P.2d at 438–40.[6] The Court of Appeals reversed the trial court with respect to all determinations concerning the Tribe's property on the ground, raised for the first time on appeal, that the district court lacked subject-matter jurisdiction to adjudicate interests in land held by an Indian tribe. *Id.* at 329, 862 P.2d at 437. Because it reversed the trial court on this ground, it did not consider the Tribe's other contentions on appeal. The County then filed its petition for a writ of certiorari, seeking our review of the jurisdictional issue.

## II.

The Court of Appeals based its holding on the ground that part of Public Law 280 (28 U.S.C. § 1360(b)) preempted state-court jur-isdiction to determine whether a prescriptive easement existed across the Theis Ranch. 116 N.M. at 327–28, 862 P.2d at 435–36. Public Law 280 is a mandatory grant of civil and criminal jurisdiction to six states (Alaska, California, Minnesota, Nebraska, Oregon, and Wisconsin) over actions arising in Indian country.[7] Section 1360(a) contains the grant of jurisdiction. Section 1360(b) provides in pertinent part:

> Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property ... belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; ... or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

The Court of Appeals construed § 1360(b) as preempting, by implication, state-court jurisdiction over properties subject to a restriction against alienation imposed by the United States. The Court said: "Although Section 1360(b) does not explicitly bar all states from exercising the described jurisdiction—it simply states that Section 1360(a) does not authorize that jurisdiction—the implication is clear. It makes no sense to deny the powers in Section 1360(b) only to those states granted broad civil jurisdiction by Section 1360(a)." 116 N.M. at 325, 862 P.2d at 433.

---

5. The trial court also entered a finding of fact stating: "[A] number of deeds appear in the abstract[s] of both plaintiffs which reserve or except from the grants any public roads that may exist therein."

6. The Court of Appeals remanded Chavez's case to the trial court for redetermination of the width of the road across her property and for specific findings on the road's location. *Id.* at 329–30, 862 P.2d at 437–38. Chavez petitioned this Court for a writ of certiorari, which we denied, 116 N.M. 553, 865 P.2d 1197 (1993).

7. The Tenth Circuit Court of Appeals has defined "Indian country" as follows:

(1) land within the limits of any Indian reservation, (2) dependent Indian communities, and (3) Indian allotments, the Indian titles to which have not been extinguished. In addition the Supreme Court has held that Indian country includes land " 'validly set apart for the use of the Indians as such, under the superintendency of the Government.' " Applying this test, the Court has concluded that Indian country includes land designated as an "Indian colony," and land held in trust by the United States for the use of an Indian tribe.

*Buzzard v. Oklahoma Tax Comm'n*, 992 F.2d 1073, 1076 (10th Cir.1993) (quoting *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 511, 111 S.Ct. 905, 910, 112 L.Ed.2d 1112 (1991), and *United States v. McGowan*, 302 U.S. 535, 539, 58 S.Ct. 286, 288, 82 L.Ed. 410 (1938); other citations omitted). The Tribe does not contend that the Theis Ranch was Indian country in October 1987 when it filed suit against the County and in fact has consistently maintained that the question whether the Theis Ranch was Indian country at that time is not pertinent to the jurisdictional issue before us.

The Court continued: "In short, Section 1360(b)'s jurisdictional bar does not apply only to states that have been granted, or have assumed, jurisdiction under Public Law 280." *Id.*

■■■ The language of § 1360(b) referring to "property ... that is ... subject to a restriction against alienation imposed by the United States" suggests that a threshold requirement to the preemptive effect of § 1360(b)—whatever it may be—is that the land be subject to a federal restriction against alienation (or that it be trust land, which was not the case here). The Tribe argues that such a restriction may be found in the Nonintercourse Act, now codified as 25 U.S.C. § 177 (1988),[8] which reads:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

Quoting from Cohen, *supra* note 8, at 484, the Court of Appeals agreed with the Tribe's argument, saying that "it now is generally accepted that 'lands acquired by [a] tribe by purchase [are] subject to federal restraints against alienation.'" 116 N.M. at 326, 862 P.2d at 434. We also agree that the Theis Ranch became subject to a restriction against alienation imposed by the United States when it was purchased by the Tribe.[9]

■■■ Having thus accepted the Court of Appeals' conclusion that the threshold requirement for applying § 1360(b) is satisfied, we come to the central question on this appeal: Does § 1360(b) preempt state-court

jurisdiction to adjudicate a preexisting interest in land that is purchased by an Indian tribe and then held by the tribe in fee simple? Generally, preemption analysis inquires whether an intent to preempt state regulation of a subject is expressly demonstrated by the language or legislative history of the federal statute or whether state regulation of the field would be incompatible with the federal system of regulation. *See, e.g., Tafflin v. Levitt,* 493 U.S. 455, 459, 110 S.Ct. 792, 795, 107 L.Ed.2d 887 (1990) ("Th[e] deeply rooted presumption in favor of concurrent state court jurisdiction is, of course, rebutted if Congress affirmatively ousts the state courts of jurisdiction.... 'by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests.'" (quoting *Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 478, 101 S.Ct. 2870, 2875, 69 L.Ed.2d 784 (1981))). However, with respect to issues of Indian law, the U.S. Supreme Court, on the one hand, has "rejected the proposition that in order to find a particular state law to have been pre-empted by operation of federal law, an express congressional statement to that effect is required," *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 144, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980); and, on the other hand, has declared that "[i]n the case of 'Indians going beyond reservation boundaries,' ... a 'nondiscriminatory state law' is generally applicable in the absence of 'express federal law to the contrary,'" *id.* at 144 n. 11, 100 S.Ct. at 2584 n. 11 (quoting *Mescalero Apache Tribe v. Jones,* 411 U.S.

---

**8.** Section 177 codifies Section 12 of "An Act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers," enacted in its entirety as ch. 161, §§ 2–30, 4 Stat. 729–35 (1834). This Act is commonly known as "the Nonintercourse Act," as was the original "Act to regulate trade and intercourse with the Indian tribes," ch. 33, 1 Stat. 137 (1790). Section 4 of the original Act contains language similar to that in Section 12 of the 1834 Act. *See* Felix S. Cohen et al., *Handbook of Federal Indian Law* 511–12 (Rennard Strickland & Charles F. Wilkinson eds., 1982).

**9.** This does not mean that adjudication of the existence of a prescriptive easement that ma-

tured before the Tribe purchased the parcel would constitute a "conveyance of ... any title or claim [to land] from any ... tribe of Indians" and would thus violate the Nonintercourse Act. Such an adjudication would not amount to "'the extinguishment of Indian title,'" *see County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 240, 105 S.Ct. 1245, 1254, 84 L.Ed.2d 169 (1985) (quoting *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 678, 94 S.Ct. 772, 782, 39 L.Ed.2d 73 (1974)), because the adjudication would not deprive the Tribe of an interest it possessed at the time it acquired the land; it would merely determine what the Tribe actually acquired when it purchased the land.

145, 148–49, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973)).

■ We view the exercise of state jurisdiction to adjudicate property interests in a tract of land acquired by an Indian tribe outside its reservation boundaries as a "nondiscriminatory state law." Anyone may invoke it; the doors of our state courthouses are, or should be, open to all. The only limitation is that in certain situations state-court jurisdiction is preempted by federal regulation (or, of course, by some provision of our constitution or a state statute). An example of federal preemption of state-court jurisdiction over an area of Indian law is 25 U.S.C. § 345 (1988) as construed by the Supreme Court. Section 345 provides that federal district courts

> are given jurisdiction to try and determine any action, suit, or proceeding arising within their respective jurisdictions involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty....

See also 25 U.S.C. § 346 (1988) (relating to procedural aspects of actions involving allotments). The Supreme Court held in *McKay v. Kalyton*, 204 U.S. 458, 27 S.Ct. 346, 51 L.Ed. 566 (1907), that federal courts have exclusive jurisdiction under §§ 345 and 346 over actions concerning Indian allotments.

Another example of an affirmative congressional ouster of state-court jurisdiction can be found in Section 17 of the Pueblo Lands Board Act, ch. 331, §§ 2–19, 43 Stat. 636–42 (1924) (codified as amended in 25 U.S.C. § 331 note (1988)), which provides in part: "No right, title, or interest in or to the lands of the Pueblo Indians of New Mexico ... shall hereafter be acquired or initiated by virtue of the laws of the State of New Mexico, or in any other manner except as may hereafter be provided by Congress...."

By contrast, Congress has made no explicit or implicit statement regarding lands purchased by a Native American tribe outside its reservation boundaries. We therefore disagree with the Court of Appeals that § 1360(b) can be interpreted as constituting an affirmative divestment of jurisdiction rather than as limiting the grant of jurisdiction in § 1360(a). Section 1360(b) begins by providing, "Nothing *in this section* shall authorize...." (Emphasis added.) This language, if it implies anything, implies a limitation on the grant of jurisdiction contained in § 1360(a). *See* 2A Norman J. Singer, *Statutes and Statutory Construction* § 47.23, at 224 n. 7 (5th ed. 1992) ("It is a rule of statutory ... interpretation that, where a restriction is not general but is provided in a specific instance, such application of the specific instance will not be carried into other statements which do not provide such limitations."); *id.* § 47.11, at 165 ("Exceptions, like provisos, operate to restrict the general applicability of legislative language.... Generally an exception is considered as a limitation only upon the matter which directly precedes it, but if a contrary intent or meaning is clearly indicated it will operate as a general limitation on all provisions of the act.").

We believe that the language in § 1360(b) was intended to operate as a savings clause to ensure that the grant of jurisdiction in § 1360(a) would not be construed to authorize the states that had been ceded jurisdiction over disputes between Indians and non-Indians to adjudicate property-law disputes that were *already* removed from the ambit of state-court jurisdiction. This interpretation is borne out by the authoritative Canby treatise (which was relied on extensively by the Court of Appeals); it states that the provisions of § 1360(b) "have not in themselves been the source of much litigation; the states were previously excluded from such actions and the statute *merely maintained the status quo*." William C. Canby, Jr., *American Indian Law in a Nutshell* 187–88 (2d ed. 1988) (emphasis added); *see also Bryan v. Itasca County*, 426 U.S. 373, 391, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976) (Section 1360(b) " 'is entirely consistent with, and in effect is a reaffirmation of, the law as it stood prior to its enactment.' " (quoting *Kirkwood v. Arenas*, 243 F.2d 863, 865–66 (1957))). Additionally, the Supreme Court has stated in the relatively recent past that "[n]othing in the language or legislative history of Pub.L. 280 indicates that it was meant to divest States of pre-existing and otherwise lawfully

assumed jurisdiction," and that "nothing in Pub.L. 280 purports to authorize States to disclaim pre-existing jurisdiction." *Three Affiliated Tribes v. Wold Eng'g, P.C.,* 467 U.S. 138, 150–51, 104 S.Ct. 2267, 2275, 81 L.Ed.2d 113 (1984).[10] In light of these authorities, we cannot agree that a complete ouster of state-court jurisdiction was meant to be implied from the exception- or proviso-like language of § 1360(b). Accordingly, we hold that § 1360(b) is a savings clause intended to make clear that in instances where existing federal statutes or caselaw had withheld state-court jurisdiction to adjudicate interests in real property belonging to an Indian tribe—i.e., when state-court jurisdiction had been affirmatively preempted by preexisting law—§ 1360(a) would not reconfer such jurisdiction.

The Court of Appeals relied on two cases from states with mandatory jurisdiction under Public Law 280, California and Alaska, for its holding that § 1360(b) deprived state courts of jurisdiction to adjudicate a non-Indian's interest in land owned by an Indian tribe. 116 N.M. at 327, 862 P.2d at 435. In *Boisclair v. Superior Court,* 51 Cal.3d 1140, 276 Cal.Rptr. 62, 72, 801 P.2d 305, 315 (1990) (in bank), the Supreme Court of California held that a trial court did not have jurisdiction to adjudicate the existence of an easement claimed by a non-Indian company over a road that traversed property which had been purchased and was held in trust by the federal government for the benefit of a tribe. Similarly, the Supreme Court of Alaska held

in *Ollestead v. Native Village of Tyonek,* 560 P.2d 31, 33–36 (Alaska), *cert. denied,* 434 U.S. 938, 98 S.Ct. 426, 54 L.Ed.2d 297 (1977), that trial courts lacked jurisdiction to determine membership in a native village for the purpose of deciding who should receive benefits from land and oil and gas leases held in trust for the village by the federal government.

Both of these cases are distinguishable in the sense that they involved trust land—a fact emphasized heavily in *Boisclair,* 276 Cal. Rptr. at 67–68, 801 P.2d at 310–11—whereas the present case does not.[11] The status of the Theis Ranch as trust or nontrust land when the Tribe filed suit in October 1987 is not before us on this appeal; the question whether state courts are divested of jurisdiction to adjudicate the existence of non-Indian property-law interests in land held in trust for the benefit of a tribe was not briefed or argued in either the Court of Appeals or this Court, and we see no reason to express an opinion on it here. Nor are we called upon to decide whether federal law preempts state-court jurisdiction to adjudicate such an interest, although we are aware of no authority (other than *Boisclair* and *Ollestead* ) clearly stating that it does. Certainly the court in *Boisclair* did not rely on any other provision of federal law—articulated either before or after passage of § 1360(b)—that preempts state-court jurisdiction over disputes like this one, except for a "complete preemption doctrine" under which, presumably, *all* disputes over property-law interests

10. The Supreme Court has said that "[t]he primary concern of Congress in enacting Pub.L. 280 that emerges from its sparse legislative history was with the problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement." *Bryan,* 426 U.S. at 379, 96 S.Ct. at 2106. The title of Public Law 280 was "An act to *confer* jurisdiction on the States ... with respect to criminal offenses and civil causes of action committed or arising on Indian reservations within such States...." 67 Stat. 588 (emphasis added). These interpretive aids, *see generally* 2A Singer, *supra,* § 45.14, at 79, suggest that preemption of state-court jurisdiction was not contemplated by the drafters of Public Law 280. *See also Wacondo v. Concha,* 117 N.M. 530, 532, 873 P.2d 276, 278 (Ct.App.1994) ("Public Law 280 was intended as an expansion of state jurisdictions for disputes involving reservation Indians and not as a

prohibition on exercising jurisdiction the state would otherwise possess. It is therefore difficult to determine how providing a state forum for tribal members who wish to sue a nonmember Indian conflicts with the goals or purposes of Public Law 280." (citation omitted)).

11. As our Court of Appeals said, the court in *Ollestead* interpreted § 1360(b) "without citing supporting authority other than the statute itself." 116 N.M. at 327, 862 P.2d at 435. We also note that less than three months after deciding *Ollestead* the Alaska Supreme Court recognized that § 1360(b) is a limitation on the grant of jurisdiction contained in § 1360(a). *See Calista Corp. v. Mann,* 564 P.2d 53, 58 n. 6 (Alaska 1977) ("We interpret § 1360(a) to be a general grant of jurisdiction *qualified* by the *limiting language* of § 1360(b)." (emphasis added)).

in land held by or for the benefit of a tribe (whether in trust or not) would be subject to the exclusive jurisdiction of the federal courts. *See Boisclair*, 276 Cal.Rptr. at 72, 801 P.2d at 315 (citing *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 393 n. 8, 107 S.Ct. 2425, 2430 n. 8, 96 L.Ed.2d 318 (1987)).[12] With deference, we do not believe that any such "complete preemption doctrine" with respect to disputes over property rights on Indian land has ever been enunciated by the U.S. Supreme Court or that any such doctrine would be appropriate in defining the scope of § 1360(b).

Our interpretation of § 1360(b) comports with this state's long-standing policy that absent "express federal law to the contrary," our courts' jurisdiction is "nondiscriminatory" in the sense that Indians and non-Indians alike may come into state court to adjudicate their disputes over state-law property interests. *See Paiz v. Hughes*, 76 N.M. 562, 564, 417 P.2d 51, 52 (1966) ("It has been held by this and other courts that an Indian has the same rights as are accorded to any other person to invoke the jurisdiction of State courts to protect his legal rights in matters not affecting either the Federal Government or tribal relations."); *Wacondo*, 117 N.M. at 531, 873 P.2d at 277 ("As a general rule, Indians may sue non-Indians in state court."); *cf. Three Affiliated Tribes*, 467 U.S. at 148–49, 104 S.Ct. at 2274 ("As a general matter, tribal self-government is not impeded when a State allows an Indian to enter its courts on equal terms with other persons to seek relief against a non-Indian concerning a claim arising in Indian country.").

## III.

■ In addition to applying the foregoing canons of statutory construction and principles of preemption, our analysis must take

into account the practical effects of divesting state courts of jurisdiction to hear cases such as this. *See, e.g., New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333, 103 S.Ct. 2378, 2386, 76 L.Ed.2d 611 (1983) (rejecting "mechanical" preemption analysis in favor of " 'a particularized inquiry into the nature of the state, federal, and tribal interests at stake' " (quoting *Bracker*, 448 U.S. at 145, 100 S.Ct. at 2584)). In the present case, the Court of Appeals' analysis leads to a troubling result. Whether an easement—a public road at that—exists across land held in fee simple is clearly an issue of state law. *See Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478, 483–84, 60 S.Ct. 628, 630–31, 84 L.Ed. 876 (1940) (ordering trustee in bankruptcy to proceed in state courts for determination of ownership of right of way because "[u]nless the matter is referred to the state courts, upon subsequent decision by the Supreme Court of Illinois it may appear that rights in local property of parties to this proceeding have—by the accident of federal jurisdiction—been determined contrary to the law of the State, which in such matters is supreme."); *United States v. City of McAlester*, 604 F.2d 42, 54 (10th Cir.1979) ("Although federal law governs the conveyance of ... tribal property, in the absence of a contrary statutory indication state law determines issues relating to the scope of an easement over tribal property once granted.").

" 'Although the federal government has long had a special relation to the American Indian, there is no jurisdiction in the federal courts to hear a case merely because an Indian ... is a party to it. A statutory grant of jurisdiction must be found.' " *Superior Oil Co. v. Merritt*, 619 F.Supp. 526, 529 (D.Utah 1985) (quoting C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3579, at 255 (2d ed. 1984), and dismissing complaint regarding Navajo Tribe oil and gas leases for lack of federal-question

12. The Supreme Court in *Caterpillar* cited *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), and paraphrased the latter case as holding that a complaint alleging a present right to possession of Indian tribal lands arises under federal law. As discussed later in this opinion, we acknowledge this position to the extent it pertains to lands held aboriginally or by treaty, but do not believe the Court would apply it to an adjudication of an easement in land that a tribe has

recently purchased from a private landowner who derived title from an original patentee of the federal government. *See Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 671, 99 S.Ct. 2529, 2539, 61 L.Ed.2d 153 (1979) (distinguishing Indians' federal-law claim under *Oneida* from "a case where the United States has patented or otherwise granted lands to private owners in a manner that terminates its interest and subjects the grantees' incidents of ownership to determination by the applicable state law").

subject-matter jurisdiction because "[plaintiff's] right of possession is based on its lease agreements with the Navajos and is protected by local—not federal—law."). Because it would concern a matter of state law, a complaint involving a disputed easement across a tract of land (such as the Theis Ranch), whether brought by the Tribe or the County, would not be entertained in federal district court. *See* 28 U.S.C. §§ 1331, 1362 (1988) (conferring original jurisdiction on federal district courts over civil actions (§ 1331) "arising under the Constitution, laws, or treaties of the United States" and (§ 1362) brought by any Indian tribe or band "wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States").

If, as the Court of Appeals held, our state courts do not have jurisdiction over this dispute and the dispute is not cognizable in federal court, neither the Tribe nor the County has a judicial forum in which to settle their respective property rights. This anomalous result, precluding a Native American tribe from bringing a trespass action such as this one, provides further support for our conclusion that the district court below had subject-matter jurisdiction to adjudicate the Tribe's and the County's claims. *See State ex rel. Newsome v. Alarid*, 90 N.M. 790, 794, .568 P.2d 1236, 1240 (1977) ("A construction must be given which will not render the statute's application absurd or unreasonable . . . .").

We acknowledge that in *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), the Supreme Court held that the tribe's assertions in its complaint invoked federal jurisdiction under 28 U.S.C. §§ 1331 and 1362. The tribe asserted that prior cessions to the State of New York of land held aboriginally and by treaty without the consent of the federal government had violated the Nonintercourse Act and were therefore invalid. However, adjudication of an easement in land recently purchased by a tribe is altogether different from cession of aboriginal and treaty land and does not constitute the "extinguishment of Indian title" that the Nonintercourse Act was intended to prevent. *See supra* note 9 and accompanying text. In short, *Oneida* is distinguishable because in that case "the

right to possession itself [was] claimed to arise under federal law in the first instance." 414 U.S. at 676, 94 S.Ct. at 782. This is entirely different from the present case, in which the Tribe's right to possession and claim of title derive from a warranty deed covering patented land and issued by a private landowner in accordance with state law. *See supra* note 12.

For the foregoing reasons, we reverse the decision of the Court of Appeals and remand the cause to that Court for consideration of the other issues in the Tribe's appeal. If the Court determines that the other issues have already been disposed of by its rulings on Natividad Chavez's appeal, the Court is instructed to remand the case to the district court for reinstatement of that court's judgment.

IT IS SO ORDERED.

BACA and FRANCHINI, JJ., concur.